# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

UNITED STATES OF AMERICA *ex rel.*
JAMES DOGHRAMJI, SHEREE COOK,
and RACHEL BRYANT,

      Plaintiffs,

      v.

COMMUNITY HEALTH SYSTEMS, INC., *et al.*,

      Defendants.

No. 3:11 C 442
Hon. Marvin E. Aspen

---

UNITED STATES OF AMERICA and
STATE OF TEXAS *ex rel.*
AMY COOK-RESKA,

      Plaintiffs,

      v.

COMMUNITY HEALTH SYSTEMS, INC., *et al.*,

      Defendants.

No. 3:14 C 2160
Hon. Marvin E. Aspen

---

UNITED STATES OF AMERICA
*ex rel.* NANCY REUILLE,

      Plaintiffs,

      v.

COMMUNITY HEALTH SYSTEMS
PROFESSIONAL SERVICES CORP., *et al.*,

      Defendants.

No. 3:15 C 110
Hon. Marvin E. Aspen

UNITED STATES OF AMERICA *ex rel.*          )
KATHLEEN A. BRYANT,                         )
                                            )
    Plaintiffs,                         )
                                            )          No. 3:14 C 2195
    v.                                  )          Hon. Marvin E. Aspen
                                            )
COMMUNITY HEALTH SYSTEMS, INC., *et al.*,   )
                                            )
    Defendants.                         )

## MEMORANDUM OPINION & ORDER

MARVIN E. ASPEN, District Judge:

Relators in the above-captioned cases (collectively "Relators") seek reasonable attorneys'

fees from defendants, Community Health Systems, Inc. and many of its subsidiaries (collectively

"CHS"), following the parties' execution of a settlement agreement that resolved all underlying

claims brought pursuant to the False Claims Act, 31 U.S.C. § 3729 *et seq*.  The parties disagree

as to whether the settlement agreement allows CHS to challenge Relators' entitlement to fees

under the False Claims Act.

Presently before us is Magistrate Judge Barbara D. Holmes' Report and Recommendation

(R. & R. (Dkt. No. 286)),[1] which interpreted the settlement agreement in Relators' favor, and

CHS's objections to the Report and Recommendation (Obj. (Dkt. No. 290)).  We consider this

matter on remand in accordance with the Sixth Circuit's instructions to consider extrinsic

evidence of the parties' negotiations "to ascertain the parties' original understanding of [the

settlement agreement's] terms." *United States v. Cmty. Health Sys., Inc.*, 666 F. App'x 410, 418

(6th Cir. 2016).  After a careful review of the extrinsic evidence submitted by the parties, the

Report and Recommendation, and the parties' briefs, we conclude that CHS's interpretation of

---

[1] Unless otherwise noted, all docket entries referenced in this opinion refer to
Case No. 3:11 C 442.  *See infra* n.2.

the settlement agreement prevails, and that the agreement does not preclude CHS from asserting challenges to Relators' entitlement to attorneys' fees. Accordingly, we modify the Report and Recommendation consistent with this opinion.

## BACKGROUND

Magistrate Judge Holmes' Report and Recommendation sets out the relevant background of this case and its procedural history. (*See* R. & R. at 1–7.) We assume familiarity with the Report and Recommendation's recitation of that history and recount it only as necessary for this opinion.

## I.    THE PRESENT DISPUTE

This dispute concerns the meaning of a provision in a Settlement Agreement (Dkt. No. 75–1) between the United States (the "Government"), CHS, and nine individuals (called "relators") who brought actions under the False Claims Act, 31 U.S.C. § 3729 *et seq.* The Settlement Agreement ended a years-long investigation into claims of improper hospital admission and billing practices at CHS hospitals nationwide. Pursuant to the Settlement Agreement, the Government intervened in all relators' cases to move for dismissal, and CHS agreed to pay the Government $97,257,500 to resolve all claims. (*See id.* ¶¶ 1, 15.) CHS received a global release, with select exceptions, from claims brought by the Government and all relators. (*See id.* ¶¶ 2–5.) However, the Settlement Agreement did not purport to release or dismiss any claims the relators may have for statutory attorneys' fees. (Settlement Agreement ¶ 15(c)(1).)

Relators in this consolidated action—Amy Cook-Reska; Nancy Reuille; Kathleen A. Bryant; and a group of individuals from Tennessee: James Doghramji, Sheree Cook, and Rachel Bryant (together the "*Doghramji* Relators")—seek reasonable attorneys' fees, expenses, and

costs for work done leading to the settlement pursuant to 31 U.S.C. § 3730(d)(1).[2]

Section 3730(d)(1) provides that when the Government intervenes in a case brought by a relator

under the False Claims Act, that relator shall receive a share of the proceeds returned to the

Government (known as a "relator's share") and "shall also receive an amount for reasonable

expenses which the court finds to have been necessarily incurred, plus *reasonable* attorneys' fees

and costs . . . awarded against the defendant." *Id.* (emphasis added). CHS seeks to challenge

Relators' eligibility to collect attorneys' fees under, as relevant here, two statutory bars contained

within the False Claims Act. *See Cmty. Health Sys., Inc.*, 666 F. App'x at 413. The first is the

"first-to-file" bar, pursuant to 31 U.S.C. § 3730(b)(5), which prevents any relator other than the

first to file in court from bringing a case based on the same allegations. The second is the

"public disclosure" bar, pursuant to 31 U.S.C. § 3730(e)(4), which generally blocks any case

filed after the operative allegations have been publicly disclosed through the media, public court

---

[2] Magistrate Judge Holmes attached a chart to her Report and Recommendation listing all involved counsel and their corresponding clients, which we hereby adopt and reattach to this opinion. (*See* Dkt. No. 286–1.) Although the Settlement Agreement resulted in Government intervention in cases brought by nine relators, (*see* Settlement Agreement Recital B), only four of those cases (encompassing six individual relators) are before this Court. The Report and Recommendation identified each case as follows:

> The four cases that were consolidated for purposes of the attorneys' fee dispute are *United States of America ex rel. Doghramji v. Community Health Systems, et al.*, Case No. 3:11-0442 (hereinafter referred to as the "*Doghramji* case" or "Case 3:11-0442"); *United States of America and State of Texas ex rel. Cook-Reska v. Community Health Systems, Inc., et al.*, Case No. 3:14-2160 (hereinafter referred to as the "*Cook-Reska* case" or "Case 3:14-2160"); *United States of America ex rel. Nancy Reuille v. Community Health Systems Professional Services, Corp., et al.*, Case No. 3:15-0110 (hereinafter referred to as the "*Reuille* case" or "Case 3:15-0110"); and *United States of America ex rel. Kathleen Bryant v. Community Health Systems Professional Services, Corp., et al.*, Case No. 3:14-2195 (hereinafter referred to as the "*Bryant* case" or "Case 3:14-2195").

(R. & R. at 2 n.1.) This opinion capitalizes "Relators" when referring to those relators in these four consolidated cases.

filings, or government communications. Both sides dispute whether CHS may assert these two statutory bars to Relators' entitlement to fees under Term 8 of the Settlement Agreement. Term 8 broadly released Relators from any claims CHS might have, but also included a reservation of CHS's rights to challenge Relators' claims for attorneys' fees. In relevant part, Term 8 reads as follows:

> CHS . . . fully and finally release[s], waive[s] and forever discharge[s] each of the Relators . . . from any and all manner of claims, controversies, actions, causes of actions, demands, torts, damages, costs, attorneys' fees, moneys due on account, obligations, judgments or liabilities of any kind whatsoever in law or equity, arising out of agreement or imposed by statute, common law or otherwise, from the beginning of time to the date this Agreement is signed, whether or not known now, anticipated, unanticipated, suspected or claimed, fixed or contingent, whether yet accrued or not and whether damage has resulted from such or not. *All Parties agree that nothing in this Paragraph or this Agreement shall be construed in any way to release, waive or otherwise affect the ability of CHS to challenge or object to Relators' claims for attorneys' fees, expenses, and costs pursuant to 31 U.S.C. § 3730(d).*

(Settlement Agreement ¶ 8 (emphasis added).)

CHS argues that the second sentence of Term 8 preserved its right to challenge Relators' statutory entitlement to attorneys' fees. Relators argue that the second sentence of Term 8 limits CHS to challenge only the reasonableness of, but not eligibility for, Relators' attorneys' fees.

## II.    PRIOR PROCEEDINGS

This dispute over attorneys' fees has been brewing for nearly five years. As such, before delving into the substance of the Report and Recommendation and CHS's objections, we briefly review how we got here.

### A.    Original Proceedings Before the District Court

After Relators settled their cases, filed their fee petitions, and those fee petitions were transferred to and consolidated before this Court, former Chief Judge Kevin H. Sharp considered CHS's objections to the petitions under the first-to-file and public disclosure bars. *U.S. ex rel.*

*Doghramji v. Cmty. Health Sys., Inc.*, No. 3:11-442, 2015 WL 4662996

(M.D. Tenn. Aug. 6, 2015), *rev'd and remanded sub nom. United States v. Cmty. Health Sys.,*

*Inc.*, 666 F. App'x 410 (6th Cir. 2016). Chief Judge Sharp determined that the second sentence

of Term 8 of the Settlement Agreement failed to preserve CHS's proffered challenges to

Relators' attorneys' fee claims. *Id.* at *8. Chief Judge Sharp reasoned that the phrase "pursuant

to 31 U.S.C. § 3730(d)" preserved only challenges or objections contained within that section,

*i.e.*, challenges to the *reasonableness* of Relators' claimed fees, but not to Relators' *entitlement*

to fees. *Id.* at *6. Chief Judge Sharp stated that CHS "could easily have specified that they

intended to raise a challenge to Plaintiffs' entitlement to fees under the first-to-file or public

disclosure provisions, or, at a minimum, simply cited Section 3730(b)(5) and (e)(4), much like

the Government reserved specific statutory rights and negotiated a carve-out for those

provisions" in Term 7 of the Settlement Agreement. *Id.* Moreover, he believed that CHS's

"silence in response to 'Recital G' which provided that 'Relators and their counsel claim

entitlement under 31 U.S.C. § 3730(d) . . . to [their] reasonable expenses, attorneys' fees and

costs,' (Settlement Agreement Recital G at 5), sp[oke] volumes." *Id.*

"Given the stakes" at play in the Settlement Agreement, Chief Judge Sharp found that

CHS's failure to include references to the False Claims Act's first-to-file bar, § 3730(b)(5), or

public-disclosure bar, § 3730(e)(4), in Term 8's reservation of rights rendered these challenges

unpreserved, leaving CHS with only the option to challenge the reasonableness of—but not

entitlement to—Relators' attorneys' fees. *Id.* at *7–8.

## B.    Remand from Sixth Circuit

On appeal, the Sixth Circuit disagreed with Chief Judge Sharp's assessment, finding

Term 8 subject to two reasonable interpretations and, thus, ambiguous. *Cmty. Health Sys., Inc.*,

666 F. App'x at 418. On one hand, two rules of contract construction—the last-antecedent

presumption and the consistent-usage presumption—favored CHS's interpretation that the phrase "pursuant to 31 U.S.C. § 3730(d)" attached only to the phrase "Relators' claims for attorneys' fees, expenses and costs" in Term 8, and therefore did not limit CHS's ability to object to the Relators' entitlement to fees. *Id.* On the other hand, these presumptions "can assuredly be overcome by other indicia of meaning," *id.* (quoting *United States v. Hayes*, 555 U.S. 415, 425, 129 S. Ct. 1079, 1081 (2009)), and Relators produced two such indicia: "[1] CHS's failure to expressly preserve the first-to-file and public-disclosure challenges in Term 8, and [2] CHS's silence in response to Recital G." *Id.*

Because Term 8 was ambiguous, the Sixth Circuit reversed and remanded to this Court to consider extrinsic evidence "to ascertain the parties' original understanding of [the Settlement Agreement's] terms." *Cmty. Health Sys., Inc.*, 666 F. App'x at 418.

### C.      Proceedings Before the Magistrate Judge

Upon remand, we referred the matter to Magistrate Judge Holmes to "conduct all proceedings necessary to determine the meaning of Term 8 of the settlement agreement, including conducting an evidentiary hearing, consistent with the mandate issued by the Sixth Circuit." (Dkt. No. 257 at 2; Case 3:14-2195, Dkt. No. 80.)[3]

In preparation for the evidentiary hearing, the parties jointly submitted 144 exhibits. (*See* Am. Joint Ex. List (Dkt. No. 269).)[4] The exhibits consisted of non-privileged email

---

[3] The parties jointly identified three issues remaining in this case after the remand. (Joint Status Report (Dkt. No. 256) at 13.) The evidentiary hearing covered only the first, concerning the scope of the Settlement Agreement "construed in light of the extrinsic evidence." (*Id.*) This opinion covers only that subject.

[4] The joint exhibits are not published on the docket, but physical copies were provided to the Magistrate Judge and conveyed to this Court for our review. The joint exhibits are referred to in this opinion by the abbreviation "JEX" followed by the corresponding exhibit number and, where appropriate, the last non-zero digits of the corresponding Bates stamp number at the lower right corner of each page.

communications between counsel for CHS, the Government, and various Relators' counsel before and after execution of the Settlement Agreement; drafts of the Settlement Agreement reflecting changes before execution; deposition testimony from several involved individuals; and assorted motions and briefs of the parties as the present dispute wended its way through various district courts.

Magistrate Judge Holmes conducted the evidentiary hearing on June 26 and 27, 2017.[5] Following the courtroom proceedings, the parties submitted post-hearing briefs (Dkt. Nos. 276, 277) and responses (Dkt. Nos. 279, 280).  Magistrate Judge Holmes issued her Report and Recommendation on August 30, 2018.  (R. & R.)

## III.    EXTRINSIC EVIDENCE BEFORE MAGISTRATE JUDGE HOLMES

As described above, the Magistrate Judge considered a large body of extrinsic evidence that she synthesized in a succinct and organized manner in the Report and Recommendation. CHS "do[es] not object to most of the facts found in the R&R (at 13–27)," and we therefore quote at length from that description to set out the evidence here.  (Mem. in Supp. of Defs.' Objs. to Magistrate J.'s R. & R. ("Mem") (Dkt. No. 290–1) at 7.)[6]  Unless indicated, all footnotes in the quoted material are supplied by this Court, and are not taken from the Report and Recommendation.

---

[5] The transcript of the evidentiary hearing is published on the docket in two continuously paginated volumes.  (Dkt. Nos. 273, 274.)  References to the hearing transcript will be denoted by "Hrg. Tr.", followed by the page and line, separated by colons, of the cited text.

[6] Although Defendants' agreement with the Report and Recommendation's recitation of evidence does not extend to the portion summarizing testimony at the evidentiary hearing, (*see* R. & R. at 27–35), we quote heavily from that section as well.

**1. Extrinsic evidence of circumstances leading up to final Settlement Agreement.**

. . .

As an initial matter, the Court notes that, under the FCA, once the Government elects to intervene in a *qui tam* action, it is the Government that controls litigation on behalf of the relators:

> If the Government proceeds with the action, it shall have the primary responsibility for prosecuting the action, and shall not be bound by an act of the person bringing the action. Such person shall have the right to continue as a party to the action, subject to the limitations set forth in paragraph (2).

> . . .

> The Government may settle the action with the defendant notwithstanding the objections of the person initiating the action if the court determines, after a hearing, that the proposed settlement is fair, adequate, and reasonable under all the circumstances. Upon a showing of good cause, such hearing may be held in camera.

31 U.S.C. § 3730(c)(1)–(2). Further, as noted during the evidentiary hearing, once the Government decides to intervene, the Government "takes over the action as the plaintiff." DE 273 at 29. Although the Government did not officially intervene in the various cases until July of 2014 following execution of the Settlement Agreement, the Government undisputedly took the lead role in negotiating the terms of the final Settlement Agreement beginning in early March of 2014.

The parties were also operating under a court-imposed deadline in finalizing the Settlement Agreement, an important contextual fact about which there is no dispute. Under the FCA, complaints filed by relators are kept under seal for at least 60 days, which is meant to allow the government time to decide whether to intervene in the action. 31 U.S.C. § 3730(b). The government may, for good cause, move for extensions beyond this 60-day window, during which time the complaint remains under seal. Here, however, the district court where Relator Scott Plantz filed his complaint apparently notified the parties that there would be no extensions beyond July 14, 2014, at which point the Plantz complaint would be unsealed and become public. DE 274 at 191; JEX 62 at 335. All parties therefore treated July 14, 2014 (the "Plantz deadline") as the operative deadline to finalize a settlement.

On March 7, 2014, then Assistant U.S. Attorney ("AUSA") John-David Thomas and Richard Sauber, one of the attorneys for CHS, reached a "handshake deal" that informally resolved all claims against CHS. JEX 3. From the outset of this handshake deal, CHS considered indispensable the condition that any global settlement include "dismissal with prejudice by each relator as it applies to them individually." *Id.* At the time, AUSA Thomas advised that any agreement to this

expected requirement "may depend upon how CHS approaches the attorney fee issue." *Id.*

Four days later, Robert McAuliffe, another attorney for the Government, sent a draft of a proposed settlement agreement to CHS's attorneys. JEX 4. This draft included the following placeholder language, which appears to represent an implicit request that counsel for CHS prepare language for the settlement agreement addressing CHS's position regarding relator attorney's fees: "**[IF APPLICABLE:** Insert logistics relating to CHS's payment to Relators for expenses, and attorneys' fees and costs]." *Id.* at 33 (emphasis in original). Recital G, which the Sixth Circuit found favorable to the Relators' interpretation of Term 8 due to CHS's failure to respond, was also included in this initial draft, though identified as Recital F: "Relators claim entitlement under 31 U.S.C. § 3730(d) to a share of the proceeds of this Settlement Agreement and to Relators' reasonable expenses, attorneys' fees and costs." JEX 4 at 32.

[CHS counsel] Sauber responded to the Government on March 13 with a revised version of the settlement agreement that did not alter or remove the placeholder language from the initial draft. *See* JEX 5. Nor did CHS's proposed revisions address the Relators' recited claims of entitlement to attorneys' fees. *Id.* Sauber's version did, however, add a paragraph ("Term 10") requiring the Relators to "release CHS . . . from any liability to Relators arising from the filing of the Civil Action, or under 31 U.S.C. § 3730(d) for expenses or attorneys' fees and costs." JEX 5 at 62–63. On March 17, another attorney for CHS, Michael Waldman, sent an email to the Government's attorney, McAuliffe, requesting copies of the sealed complaints filed by each of the Relators in this case, which Waldman said would "allow [CHS] to work through some of the first-to-file issues." JEX 6. No further explanation of the substance or timing of the anticipated first-to-file issues was given.

The Government accepted the insertion of Term 10 in the draft settlement agreement on March 20, but advised CHS that any release of claims for attorneys' fees would have to be negotiated directly with the Relators. JEX 8. On April 21, the Government, via attorney Melissa Handrigan, emailed a copy of the revised settlement agreement, which included Term 10, to counsel for each of the Relators. JEX 16. This group included Reuben Guttman, Traci Buschner, and David Young (counsel for the Tennessee Relators), Mitch Kreindler (counsel for Kathleen Bryant), Matthew Organ (counsel for Scott Plantz and Nancy Reuille), Jan Soifer and Patrick O'Connell (counsel for Amy Cook-Reska and Nancy Reuille), Mark Raspanti (counsel for Thomas Mason), and Ronald Osman (counsel for Brian Carnithan). *Id.*; DE 276–1 at 2. See Appendix.[7] The Government requested "comments" from the Relators' counsel regarding the provisions in the draft settlement agreement and imposed a deadline of May 9 for the Relators to reach a

_____

[7] Here the Report and Recommendation refers to the chart listing all involved counsel and their corresponding clients, which we have adopted and attached as well. *See supra* n.2.

sharing agreement delineating the manner in which they planned to distribute the statutory relator's share among the group. JEX 16 at 339.

The Relators discussed the proposed agreement over the next several days. On April 25, Osman suggested that CHS and the Government insert a "carve out" provision if the parties could not come to an agreement over fees, ostensibly meaning that the issue of attorneys' fees would be addressed after the parties had executed a settlement agreement. JEX 17 at 367 and 370. Osman also commented that if the attorneys' fees were not resolved in the settlement, litigation would need to occur in the district where each complaint was filed. JEX 17 at 375.[8]

Raspanti similarly referenced an attorneys' fees carve out provision, noting that "due to the scope of the Relators' release in Paragraph 5," which released CHS from any liability under the FCA subject to CHS's payment of the agreed settlement amount ("Term 5"), the Relators would need "an agreement on attorneys' fees or the usual carve out language if attorneys' fees and costs are not resolved before the execution of the . . . agreement." JEX 18 at 25. Soifer and O'Connell appear to have agreed with this opinion (see JEX 18, 19),[9] while Kreindler proposed that Terms 5 and 10 be combined in an effort to "prevent [the Government] from separating the issue of attorneys' fees from the settlement by making clear that they are a single issue." JEX 21. Organ drafted a revised version that included Kreindler's proposal and submitted it to the Government on April 29. JEX 24 at 88 and 91. This version of the settlement agreement still included the placeholder (now renumbered as Term 3) for a description of the logistics for payment of attorneys' fees to the Relators. *Id.* at 87.[10] In his accompanying email to the

---

[8] The Report and Recommendation concludes, in a footnote, "Given the inclusion of the Relators' recital of entitlement to attorneys' fees under § 3730(d), the discussions at this time among the Relators and the Government about carving out fees are clearly referring to reasonableness objections only." (R. & R. at 17 n.14.) As will become clear, we reach a different conclusion regarding the import of the recital claiming entitlement to attorneys' fees.

[9] Specifically, O'Connell commented on Raspanti's notes that "we agreed that our main concern was the mutual release for the relators and the exclusion of att[orne]y fees from the settlement unless the fees are agreed upon prior to the execution of the settlement agreement." (JEX 19 at 32.)

[10] Organ's version also retained the Middle District of Tennessee as the chosen forum for all claims arising under the settlement agreement. (JEX 24 at 97, ¶ 20.) O'Connell emailed Organ, Soifer, and Kreindler on April 29 to remark that he had "obviously glossed over" that provision in the draft, and stated his belief that Relators should agree to litigate in the Middle District of Tennessee only if the parties reach "complete agreement to pay our fees and costs" included in the settlement. (JEX 25 at 105.) Soifer concurred that they should not agree to the Tennessee venue unless all fees were "agreed 100%." (*Id.* at 104.) Organ agreed with O'Connell and Soifer, but stated, "if we have an agreement [on payment of fees], venue doesn't matter. If we don't have an agreement, we don't sign the agreement, and the venue provision won't matter to us." (*Id.*) These concerns were evidently allayed when the Government incorporated Osman's

Government, Organ made clear that the suggested revisions "assume that we are able to successfully resolve the issues raised in our April 9, 2014 letter to you, including Relators' claims for attorneys' fees." *Id.* at 81.[11]

On May 7, the Government, acting as an intermediary between the Relators and CHS for finalization of the settlement, advised the Relators that CHS had requested fees information from any Relator that planned to file an application for attorney's fees. JEX 26. This May 7 email from the Government's counsel to the Relators' attorneys identified Waldman and Sauber as the individuals to whom such information should be sent. *Id.*

David Garrison, another attorney representing the Tennessee Relators, sent the first documented correspondence to counsel for CHS on May 9, in which he identified, and expressly claimed entitlement to, more than $3 million in attorney's fees and expenses under 31 U.S.C. § 3730(d). JEX 27 at 553. Counsel for other Relators followed suit with similar communications on May 12 (Organ), May 19 (O'Connell), and June 6 (Guttman and Kreindler). JEX 28, 38, 47, 48. Other Relators also specifically referred to the fees as incurred at the request of the Government and in "furtherance of claims for which CHS will be obtaining a release from [the Relators]." JEX 38 at 2 [(O'Connell letter)]. On May 13, Guttman also inquired about CHS's anticipated "time frame" for resolving the attorneys' fees claims, to which CHS's attorney, Waldman, responded on that same day: "[W]e don't have any deadlines, but the sooner CHS has the fee requests with backup the sooner it can respond and hopefully resolve." JEX 30 at 825.[12] Despite the clear statements by each group of Relators claiming entitlement to fees, CHS did not take this opportunity to state that it intended to contest all fees other than those of the first relator to file.

On May 14, the Government's attorney, Handrigan, circulated an updated draft of the proposed settlement agreement, which removed the Term 3 placeholder language for payment of the Relators' attorneys' fees, replacing it instead with language intended to "reflect that relator's share and attorneys' fees will be addressed after the settlement agreement is executed[.]" JEX 31 at 394. The operative language, in Term 15, stated the following:

---

suggestion to carve out attorneys' fee disputes from the forum selection clause. (*See* JEX 31 at 410, ¶ 18.)

[11] As the Report and Recommendation observes, "The Relators' April 9 letter does not appear to have been offered as an exhibit to the evidentiary hearing." (R. & R. at 17 n.15.)

[12] "In a separate correspondence, Waldman clarified that 'backup' referred to 'copies of time records and other back up that support your claims for fees and expenses.' JEX 30 at 825." (R. & R. at 18 n.16.)

(c) Provided, however, that the following claims shall not be dismissed, unless they are settled, adjudicated, or otherwise resolved, and any required consent by the United States is obtained, and the Courts are so informed:

(1) Relators' claims for reasonable attorneys' fees, expenses, and costs pursuant to 31 U.S.C. § 3730(d)[.]

*Id.* at 410. Notably, this language is almost identical to the language that was ultimately included in the final Settlement Agreement, particularly the relevant portion of Term 8, the limiting phrase "pursuant to 31 U.S.C. § 3730(d)," at the crux of the Court's analysis. The May 14 draft of the settlement agreement also included the Relators' requested provision that their fee claims could be brought in the different jurisdictions where each case was filed. *Id.*

On May 15, in response to the Government's "carve out" of the attorneys' fees issue, Organ emailed counsel for the other Relators to alert them that the Government was "concerned that [Relators] are taking too long to work out relator share and attorney fee issues, but that it is still possible that we get those all resolved if we keep moving." JEX 33 at 132. Organ contacted the other Relators' counsel again the following day to assure them, regarding the placeholder deletion, that "[i]t is my understanding that the provisions were pulled from the latest draft out of a concern that there is not enough time to resolve those issues—not because [the Government] and CHS are not still willing to address those issues." JEX 34 at 417. To that end, Organ encouraged all of the Relators to quickly finalize and execute the sharing agreement pertaining to the relator's share. *Id.*

There is little doubt that the Relators, even while contemplating a carve out of objections to reasonableness of attorneys' fees, recognized at least the possibility that CHS might make some attempt to avoid paying all of Relators' attorneys' fees. The Relators attempted to directly address this possibility. On May 29, Organ sent a revised draft settlement agreement with O'Connell and Soifer's proposed revisions, which included the following unnumbered term:

In exchange for the releases described in Paragraph 6 below . . . CHS agrees to pay to Relators their reasonable expenses, attorneys' fees and costs. Any disputes between CHS and any Relator regarding the reasonableness of that Relator's request for expenses, attorneys' fees and costs shall be brought in the United States District Court in which that Relator's action is pending.

JEX 43 at 486. And included "Term 6," which stated:

Notwithstanding the releases given in paragraphs 2–5 . . . of this Agreement, or any other term of this Agreement, the following claims of the United States and/or Relators are specifically reserved and are not released:

. . .

Relators' claims for reasonable attorneys' fees, expenses, and costs pursuant to 31 U.S.C. § 3730(d).

Id. at 489–90.

On June 2, the Government hosted a teleconference with counsel for the Relators to discuss, among other things, the proposed revisions, during which, according to a subsequent email from Buschner to Organ, the Government advised the Relators that the issue of attorneys' fees was beyond the Government's purview: "I think [then AUSA John-David Thomas] is right on the fee situation, no matter what [the Government] does it's probably not going to make a difference. Hopefully we will all get our fees." JEX 45 at 925. Two days later, Handrigan sent a revised draft of the settlement agreement to CHS with an accompanying email indicating that the Relators and the Government had agreed to reserve the attorneys' fee issue until after the settlement agreement was executed: "With regard to share/[attorney's] fees, those issues were carved out of this agreement so we can move the settlement along quickly. They can be addressed in separate agreements with relators." JEX 46 at 830. The reservation of the attorneys' fees issues was in Term 16 of this revised draft, and additionally referenced in Term 17 relating to each party bearing its own costs. Id. at 847–48. The June [4] revised draft also included the exception to the forum selection clause for attorneys' fees disputes to be litigated in the district where each complaint was filed. Id. at 848. However, the Government's revised draft did not remove the previously unnumbered term, now identified as "Term 2," in which CHS "agree[d] to pay to Relators their reasonable expenses, attorneys' fees and costs."[13] Id. at 837.

On June 9, CHS, via Waldman, responded to the Government with its own revisions. JEX 50 at 893. CHS's draft deleted the Relators' proposed Term 2 and included the version of Term 8 that is the subject of the current dispute. Id. at [893,] 897. The draft also retained reservation of the claims for fees pursuant to § 3730(d) (but now again in numbered Term 15 due to the deletion of Term 2) and made no change to either the carve-out now in Term 16 for fees awarded under § 3730(d) or the exception to the Middle District of Tennessee forum selection clause (now Term 18). Id. at 901–03. Waldman's accompanying email to the Government included a statement that CHS's proposed settlement agreement "makes clear that [] CHS is preserving its rights to object to the various relators' claims for attorneys['] fees[.]" Id. at 886. No other information was provided as to the grounds on which CHS contemplated such objections could be made. On June 10,

---

[13] We refer to this draft provision as "Term 2" throughout the subsequent analysis.

the Government relayed CHS's proposals, including Waldman's comments regarding fees, to the Relators and recommended that, in light of the pending dispute as to attorneys' fees, the Relators reach out to CHS's attorneys directly to resolve the issue. JEX 53 at 292.

In response, Organ set up a conference call with the other Relators and the Government. *Id.* At the same time, Buschner sent an email to Organ indicating she would assent to CHS's revisions: "I'm okay with the agreement as is. . . . As to CHS not agreeing to pay us fees, I assumed that would be the case." JEX 54 at 929. Organ submitted a letter to Waldman that same day, in which Organ advised that his clients were "prepared to proceed with the [attorney's] fee petition process if necessary, [although] we hope the attached un-redacted time records will help move this negotiation forward and allow us to reach an amicable resolution on this issue." JEX 57 at 936. O'Connell also sent an email to Waldman on June 10, in which he clearly stated his Relator clients' intention to seek fees under § 3730(d), and offered to submit time records as an attempt to reach a resolution of any attorney's fees issues. JEX 58. Waldman responded that CHS agreed to the conditions for submission of the time records (JEX 59), but did not state that the issues in dispute included recoverability of fees. On June 20, Soifer sent an email to counsel for Relators Scott Plantz and Kathleen Bryant recounting a conversation with Waldman in which Waldman requested a different breakdown of fees, presumably because of first-to-file issues. JEX 60. Soifer relayed that she explained to Waldman "about the first four cases all working together at the behest of the DOJ, working on the national case" and that, for that reason, all of the Relators' attorneys "needed [their] fees paid," adding that "[i]t seemed clear he had no clue." *Id.*

. . . On June 23, O'Connell emailed Handrigan with a bleak forecast following a June 20 telephone conversation with Waldman: "[I] am not optimistic that CHS will enter into agreement to pay fees before July 21. They are already making noises about claiming first to file challenges to fees. . . . So, the fees will have to be handled after the settlement." JEX 61 at 333. The following day, Organ emailed Waldman and Sauber to convey objections to CHS's deletion of Term 2, arguing that "because the Government is intervening in Relators' cases, and Relators are dismissing their claims in their entirety, Relators are entitled to their reasonable expenses, attorneys' fees and costs." JEX 63 at 1206. Organ further advised Waldman and Sauber that if CHS was unwilling to resolve attorneys' fees and expenses as part of the settlement, "[Relators] will need to revisit the language in the settlement agreement, and prepare our petitions for attorneys' fees." *Id.*[14] Later email exchanges, from June 25 through July 1, between CHS's counsel and these same attorneys confirmed that this particular group of Relators asserted their entitlement to attorneys' fees, which CHS continued to refer to as an open issue. JEX 65, 66, 69, 70.

(R. & R. at 13–23.)

---

[14] "Only attorneys for Relators Nancy Reuille, Amy Cook-Reska and Scott Plantz were included in these email exchanges." (R. & R. at 23 n.19.)

We pause to emphasize the just-cited email exchange. Waldman, representing CHS, clearly indicated on June 25 that first-to-file challenges were an active possibility as CHS collected billing information from attorneys for relators Reuille, Cook-Reska, and Plantz. (JEX 64.) He stated that CHS's "ability to work out an agreement on attorneys' fees also is hampered by your refusal to break out your fee request [by client] . . . or to identify which of your clients you believe is the first to file." (*Id.* at 1208.) He asserted that if the attorneys believed Plantz was the first to file, "of course, then O'Connell Soifer [representing Reuille and Cook-Reska] would not be entitled to recover their attorneys' fees for work on" the main improper billing claim. (*Id.*) Organ sent a lengthy response to Waldman on June 26 that addressed the topic of "[e]xpenses, [c]osts and [f]ees," including CHS's "concerns about 'duplicative work' and 'first to file' issues." (JEX 66 at 1213.) Organ explained that his and O'Connell and Soifer's firms had worked cooperatively, under a formal agreement and at the Government's direction, on the overall False Claims Act investigation. (*Id.*) Organ also directly addressed CHS's first-to-file concern:

> As you undoubtedly know, any first-to-file analysis is complicated and fact-intensive. While we understand the strategy behind your first-to-file questions, forcing Relators to take positions on first-to-file as a precondition for engaging in [fee] settlement discussions may affect certain Relators' willingness to sign the settlement agreement and forfeit claims that they would otherwise have the right to pursue. Even if all Relators and their counsel sign the settlement agreement, we believe that all Relators will take the position that their work was in support of [the Government's] successful, coordinated national investigation, and is therefore recoverable under 3730(d)(1). However that multi-jurisdictional battle turns out, neither CHS, nor Relators, will have complete peace, all parties will have to bear significant expense, and CHS will have to pay for *at least* one Relator's fees for fighting that battle . . . . [I]f you are willing to negotiate the reasonableness of our expenses, fees and costs, we are confident we can reach a reasonable resolution. If you are not willing to do so because we will not identify which of our clients is "first to file," then we will have to revisit the language in the settlement agreement we are being asked to sign.

(*Id.* at 1213–14.)

Kreindler, representing Kathleen Bryant, separately emailed Organ on June 27 to inquire about the status of negotiations with CHS. (JEX 67.) Organ responded on June 30 that he was waiting for a response to his lengthy email to CHS (JEX 68), and forwarded Kreindler the full exchange to that point. (JEX 69.)

The Report and Recommendation continues:

> With the Plantz deadline imminent, Sauber confirmed to the Government on July 7 that CHS would "carve out . . . the attorneys['] fees" language from the Settlement Agreement and provided a revised draft to that effect so that the parties could "push this through[.]" JEX 72, 73. The updated revisions included a change to Terms 3 and 15 to indicate that nothing in the settlement agreement would be construed to release "any claims Relators *may have* for reasonable attorneys' fees, expenses, and costs pursuant to 31 U.S.C. § 3730(d)[.]" JEX 73 at 1229, 1237 (emphasis added). But the exception language in Term 16 to the provision of each party's responsibility for its own costs remained unchanged: "[e]xcept for Relators' rights pursuant to 31 U.S.C. § 3730(d)" (JEX 73 at 1237), as did the exception to the forum selection clause for attorneys' fees disputes (JEX 73 at 1260) and the last sentence of Term 8 (JEX 73 at 1232) with the language currently in dispute. The Government forwarded the updated settlement agreement to Organ [and all other Relators' counsel] and noted that these revisions "carv[ed] out the attorneys' fees" from the document. JEX 74 at 663.

> Multiple email exchanges took place over the next two days among the Relators in response to CHS's revisions. On July 8, counsel for Relators Bryant (Kreindler) and Mason (Raspanti) predicted that following execution of the settlement agreement by all parties, CHS would likely argue that at least five of the Relators' claims for attorneys' fees were barred. JEX 79.[15] While they also concurred that a "settlement under all circumstances[] includes attorneys' fees," there was no interest in holding up the settlement to "advance that view." *Id.* at 746 (internal quotation marks omitted). But both also asserted that the Relators were "at a minimum, entitled to know CHS's position on [attorneys'] fees before we sign off on the settlement." *Id.* Counsel for the Tennessee [*Doghramji*] Relators (Buschner) replied that while the situation was "not ideal," it was common for attorneys' fees issues to be resolved after a settlement agreement was entered and advised that "it would be a disaster" if the presiding judge learned that settlement was being impeded by disagreements regarding fees. JEX 81 at 754.

> Counsel for Relator Carnithan (Osman) suggested that the Relators refuse to sign the settlement agreement "until CHS commits to payment of attorneys[']

---

[15] Specifically, Kreindler stated that CHS's "deafening silence makes me think they are waiting for the settlement to be finalized so they can use it as a sword against at least 5 of the relators' claims for fees." (JEX 79 at 746.)

fees for all Relators[, subject to proof of time spent, reasonableness, etc.]" (*id.*), and noted that the Government "certainly cannot settle the case in its present posture without our agreement." JEX 82 at 460.[16] In a separate email chain to only the Non-[*Doghramji*] Relators, Kreindler asked whether anybody was "uncomfortable signing off on [the carve out of attorneys' fees] without having a clearer picture of CHS's intent on attorneys' fees[.]" JEX 83 at 464. Organ responded the following day, July 9, as follows:

> I talked to [John-David Thomas] yesterday and shared our concerns about fees and relator share. He told me that CHS is absolutely going to fight about fees and won't agree to the language I proposed before.[17] Based on our very limited interaction with CHS's lawyers, that sounds right to me. I asked Melissa to help us on the issue by explaining all that we did at DOJ's request, and pushing them to negotiate. She said she would to talk to some people at DOJ about that request, but I got the distinct impression that she won't do much. And if she did, I don't think it would make a significant impact because CHS knows DOJ will NOT allow the settlement to get held up over our fees. So, the issue is whether to refuse to sign without language pursuant to which CHS agrees to pay our fees, subject to a reasonableness determination. I'm not exactly sure how that would play out, but I strongly suspect DOJ would threaten us with all sorts of things, including relator share. And I do not think a court would look kindly upon our refusal based on fees when there is a process by which we can seek our fees after the settlement.

JEX 84 at 469 (capitalization in original). Kreindler replied: "I don't mind signing off on the agreement, but I think we are entitled to know where things stand on all the outstanding issues." JEX 85 at 427.

Kreindler then directed the following statement to Waldman and Sauber on July 9: "[b]efore signing off on the settlement agreement, I think we are entitled to know [CHS's] position on attorneys' fees." JEX 86 at 1292. Sauber's response was notably non-committal: "We have consistently told [the Government] we will carve out the fees from the settlement and have sent them a draft doing just that. We will address these issues after the settlement is accepted." *Id.*

Kreindler, clearly unimpressed, asserted that CHS's position was "not acceptable" in light of CHS's previous request that all of the Relators provide their

---

[16] "Osman's email also included this prophetic statement: '[I] will not hold up the settlement for the rest of the Relators and attorneys but I reserve the right to say 'I told you so' when all of you spend the next 2 years fighting over your fees[.]' JEX 82 at 460." (R. & R. at 24 n.20.)

[17] "This apparently refers to the proposed language Organ added to (what became) Term 2 in which CHS 'agrees to pay to Relators their reasonable expenses, attorneys' fees and costs.'" (R. & R. at 24 n.21.)

billing records and requested that Sauber "provide a substantive response regarding CHS's position." JEX 91 at 1342. Sauber refused to affirmatively indicate whether CHS planned to assert any recoverability challenges and vaguely reiterated that CHS had "repeatedly" advised the Government that attorneys' fees would have to be resolved after the settlement was finalized. *Id.* Sauber further advised Kreindler that the issue could not be resolved prior to the July 14 Plantz deadline in part because "some issues arose that will need discussion or litigation[.]" *Id.* But, no further clarification of the specific issues to be litigated was given.

Presumably because of the impending deadline and the Government's anticipated response to any attempt by the Relators to delay the settlement for further resolution of attorneys' fees issues, the Relators proceeded with finalizing the settlement. Relators Plantz, Cook-Reska, and Reuille, via their attorneys (Organ and Soifer), advised on July 11 that they would accept the latest version of the settlement agreement, which included the CHS revisions to certain attorneys' fees provisions. JEX 92 at 502. The Tennessee [*Doghramji*] Relators (via Buschner) confirmed their acceptance of the settlement agreement terms on July 14, while Relator Bryant and her attorney, Kreindler, provided their signatures on July 17. JEX 93; DE 75–1 at 27. The Government circulated the finalized settlement agreement to CHS on July 17. JEX 94. CHS executed and returned the settlement agreement on July 23 (JEX 96) and the Government filed the notice of settlement on August 4. DE 75.

### 2. Extrinsic evidence of occurrences after execution of the Settlement Agreement.

Following execution of the Settlement Agreement, CHS, via Waldman, continued inquiring about the relator's share (JEX 95, 99) until Handrigan informed Waldman of the Government's allocation on August 8, 2014. JEX 102. Shortly after that, in an August 13 call with attorneys for some of the Relators, as described in a status update by Organ to the other Relators' counsel, CHS's attorneys finally and expressly acknowledged that they intended to raise eligibility challenges to fees, in resolution of which they offered to pay a sum certain for a global settlement of all attorneys' fees issues. [JEX] 104 at 890. Separate discussions then continued between various Relator's counsel and CHS about resolution of attorney's fees incurred on behalf of specific Relators. *See e.g.* [JEX] 106, 109, 110,[18] 111, and 118. During this same time, CHS continued to inquire of the Government about relator shares. *See e.g.* [JEX] [112,] 113, . . . 116, 117. About a month later, CHS also began making requests of the various federal district courts to transfer all of the fee applications to the Middle District of Tennessee. JEX 114. In their papers,

---

[18] This email, from O'Connell to Waldman on August 29, states O'Connell and Soifer's position at length. O'Connell wrote it was their "view that [they] were working for the United States during the entire pendency of this case." (JEX 110 at 1474.) Furthermore, O'Connell believed it "disingenuous [for CHS] to now make a first-to-file argument AFTER [CHS] was dismissed from the cases. The FCA [False Claims Act] does not provide a defendant the ability to raise a first-to-file defense to the payment of attorneys' fees and expenses in successfully settled cases." (*Id.*)

CHS asserted that "it would be grossly inefficient—and create a risk of inconsistent judgments—for seven tribunals to pass upon [the first-to-file] issue at the same time." *Id.* at 4. However, CHS made no such contentions in response to the forum selection exception proposed by Relators during finalization of the Settlement Agreement. In fact, no evidence was offered that, pre-settlement, CHS raised any issues about the venue clause. CHS's filings to consolidate the fee requests in one court also included the statement that the Settlement Agreement "reserves the issue of which relator (if any) is entitled to recover attorneys' fees under 31 U.S.C. § 3730(d)." *Id.* at 8 (emphasis added). However, CHS did not include this additional clarification of entitlement to fees in the language of the Settlement Agreement, or in response to any of the Relators' multiple requests for clarity on the issue.

(R. & R. at 23–27.)

### 3. Testimonial evidence of the parties' understanding of the meaning of the Settlement Agreement.

During the July 26 and 27, 2017 evidentiary hearing on the parties' understandings of the meaning of the Settlement Agreement, the following individuals testified: former Assistant United States Attorney Thomas; Waldman, counsel for CHS; O'Connell, counsel for Relators Reuille and Cook-Reska; Kreindler, counsel for Relator Kathleen Bryant; and Garrison, local counsel for the *Doghramji* Relators. (*See* Dkt. Nos. 273–74.) We continue the Report and Recommendation's synthesis, with our observations emphasized separately or in footnotes.

#### a. The Government

Former AUSA John-David Thomas, one of the primary attorneys for the Government at the time, testified at the remand hearing that he has no recollection of CHS ever specifically communicating that it intended to litigate first-to-file or public disclosure issues with any Relator post-settlement. DE 273 ("Hrg. Tr.") at . . . 45:15–46:23. However, Thomas also stated that, based on his familiarity with the Relators' complaints and CHS's questions about the first relator to file, he could "read the tea leaves" that CHS was interested in the first-filed complaint for any available purpose, including to challenge entitlement to attorneys' fees. Hrg. Tr. 23:19–25 and 24:1–7, 62:21–63:22. Later in his testimony, Thomas stated that the purposes for which a settling defendant in an FCA case asks about first-filed complaints might depend on when that information was requested, implying that, even though CHS requested information in March about the timing of the filed complaints, which suggests an intention to assert a first-to-file challenge, CHS may have decided on a different course by the time of execution of the Settlement Agreement in July. Hrg. Tr. 63:8–22.

Although Thomas acknowledged that he understood from ongoing conversations with CHS's counsel that CHS intended to pay fees only to those Relators who received a relator's share (Hrg. Tr. 68:21 through 69:10), there is no indication that supposition was shared with the Relators.[19] In fact, Thomas also testified that not all of the Government's communications with CHS or with the Relators were conveyed to the other parties. Hrg. Tr. 22:18–23:14. He also acknowledged that, generally, the communications between the Government and CHS about which Relators were going to be paid, and referring to CHS's need to work through first-to-file issues, were not conveyed to the Relators. Hrg. Tr. 86:20–87:7.

Thomas also acknowledged that CHS never specifically stated that any of the Relators were not proper parties for purposes of the settlement or not entitled to participate in the settlement. Hrg. Tr. 23:15–24:7.[20] Nor did CHS suggest that the settlement should be delayed to allow CHS to move for dismissal of one or more Relators (Hrg. Tr. 24:8–12) or that the Government should not intervene in any fewer than all of the seven cases. Hrg. Tr. 28:3–5, 31:6–11. Instead, Thomas confirmed that, as part of the settlement, CHS consistently insisted on dismissal of all of the Relators' qui tam claims. Hrg. Tr. 24:13–15, 25:2–5 and 16–20, 27:6–28:2.

### b. Relators

The testimony of the Relators' attorneys was, not surprisingly, substantially similar to the arguments made by the Relators throughout this contested matter about the meaning and substance of the Settlement Agreement generally and Term 8 specifically.

### i. Mitchell Kreindler [Counsel for Relator Kathleen Bryant]

Specifically, Kreindler testified that he interpreted the final sentence of Term 8 as essentially interchangeable with the Relators' proposed provision in Term 2 that was stricken by CHS. Hrg. Tr. 128:22–129:15. Kreindler testified that he did not construe CHS's striking of the affirmative obligation to pay reasonable attorneys' fees as a statement that CHS intended to preserve challenges to both

---

[19] Thomas did acknowledge, however, that Waldman emailed the Government when CHS struck Term 2, added the disputed sentence in Term 8, and remarked that the changes "make[] clear that . . . CHS is preserving its rights to object to the various relators' claims for attorneys['] fees," which the Government then forwarded to all Relators' counsel. Hrg. Tr. 74:16–78:3 (quoting JEX 53).

[20] Thomas did, though, testify that "CHS was clearly focused on questions about first filed and seeing the qui tam[] [complaints]." Hrg. Tr. 23:21–22; *see also id.* 59:15–60:7 (acknowledging that CHS "wanted to know who the first-to-file was" and asked for the Government to send CHS the Relators' complaints).

recoverability and reasonableness. Hrg. Tr. 108:7–109:19. Instead, Kreindler viewed the addition of an exception to CHS's broad release and waiver for § 3730(d) fees as consistent with the Relators' expectation that CHS was preserving only challenges to reasonableness of fees. Hrg Tr. at 109:20–110:9. Simply put, regardless of the placement of the attorneys' fee provisions, Kreindler interpreted it as carving out only objections to the amount of fees and not as to recoverability.[21] This interpretation was supported, according to Kreindler, by CHS's agreement to leave in the venue provision for resolution of fee disputes in the federal courts where the qui tam complaints were originally filed. Hrg. Tr. 109:5–8. Further, in the context of having requested that CHS disclose the substance of its intentions about attorneys' fees objections, Kreindler considered this provision to be a limited reservation because CHS did not state otherwise when asked. Hrg Tr. 169:3–17 ("I know what the agreement says, I want to know what you're really going to do.")

Kreindler's query about CHS's actual intent followed a series of email exchanges with CHS's counsel about attorney time records and other fee request information that was forwarded to CHS. Hrg. Tr. 116:16–118:20. Kreindler made multiple inquiries about the status of the fees requested. *Id.* Eventually, Kreindler requested that CHS give a more substantive, definitive response regarding its position on attorneys' fees. Hrg. Tr. 118:25; JEX 86 and 91. CHS's attorneys did not provide the requested response, instead deferring to resolution of fee issues after settlement. Hrg. Tr. 119:9–13; JEX 91. At no point, according to Kreindler, did CHS affirmatively state that it was planning to challenge fees on eligibility grounds, which Kreindler understood to mean that only reasonableness challenges were preserved. Hrg. Tr. 119:14–17.

Kreindler also testified that, in his experience in FCA cases, § 3730(d)(1) comes into play only when the relator has been successful, that is, when the government has intervened and there are funds recovered either by settlement or by judgment. Hrg. Tr. 113:11–23. Kreindler could not recall any other case in his 23 years of handling FCA cases in which a defendant raised a first-to-file, public disclosure, or other similar challenge to a relator's standing after settlement unless those issues were reserved prior to settlement. Hrg. Tr. 119:18–120:11.

On cross examination, Kreindler acknowledged that he believed during the settlement language process that CHS might have had ulterior motives. Hrg. Tr. 155:20–156:16. But, he also suggested that the extent to which CHS more overtly disclosed its intentions about first-to-file may have depended on the separate negotiations that CHS was pursuing with individual Relators. Hrg. Tr. 150:19–151:4, 167:23–168:5. Kreindler also testified that his efforts and those of other Relators' counsel for more definitive responses from CHS about the meaning of the settlement language went unanswered, which left him with the understanding that CHS was preserving only what the Settlement Agreement

---

[21] Kreindler could not recall ever communicating this interpretation to anyone in writing or orally, except to suggest that he "might have" said it to Osman at some point on an unspecified call. Hrg. Tr. 133:6–16, 159:21–160:3.

provided for, namely, reasonableness of fees under § 3730(d). Hrg. Tr. 159:13–14, 166:2–4, 169:7–17, 170:20–171:3.

(R. & R. at 27–31.)

We emphasize the following additional points from Kreindler's testimony. First, when Kreindler pressed CHS for a substantive response on its intentions regarding attorneys' fees, Kreindler testified that he considered a challenge to fee entitlement as among the possible responses. Hrg. Tr. 119:4–8 ("I wanted to know in more detail what [CHS's] decision was going to be; were they thinking our fees were unreasonable; . . . did he think I wasn't entitled to receive my fees. I wanted a more definitive response.") Second, Kreindler acknowledged that first-to-file issues were always a background concern for all Relators' counsel, Hrg. Tr. 126:10–11; 150:14–16, and he remarked in an email that CHS could use the settlement agreement as a "sword" against those Relators who were not first to file. Hrg. Tr. 156:13–16 (referencing JEX 79).

### ii. Patrick O'Connell [Co-counsel for Relators Nancy Reuille and Amy Cook-Reska]

Patrick O'Connell generally echoed Kreindler's experience in FCA cases, that he too was unaware of any other case in which a defendant sought to challenge a relator's fees on eligibility grounds after settling with the relator. Hrg. Tr. 361:18–362:10. O'Connell's testimony also suggests that he too was satisfied that CHS was not going to fight fees on first-to-file or other recoverability challenges because of CHS's agreement that fees would be litigated in the districts in which the qui tam complaints were pending. Hrg. Tr. 383:6–13, 399:4–8. While O'Connell's testimony makes clear that he had at least some inkling that CHS might raise post-settlement eligibility issues, in his estimation, specific considerations unique to his clients afforded him a level of comfort in proceeding without an explicit clarification by CHS on the scope of the reservation. Hrg. Tr. 391:2–5, 409:6.

(R. & R. at 31.) O'Connell was unconcerned about potential eligibility challenges because, first, he believed that the False Claims Act awarded a relator reasonable attorneys' fees by operation of law once the Government decides to intervene, and second, he believed his clients were, in

fact, the first to file. Hrg. Tr. 377:22–378:7; 381:9–16; 393:4–11, 18–24; 411:2–7. Despite this understanding, O'Connell was aware before the Settlement Agreement was signed that it was possible that CHS would challenge Relators' entitlement to attorneys' fees. Hrg. Tr. 428:6–19. O'Connell did not communicate to fellow Relators' counsel his belief that the Settlement Agreement as executed accomplished the same goal as Term 2, which had previously entitled Relators to reasonable fees before CHS struck it. Hrg. Tr. 436:20–437:4.

> O'Connell also confirmed Kreindler's testimony that, during finalization of the settlement language, separate negotiations were ongoing between CHS and specific Relators about fees independent of the entire group. Hrg. Tr. 365:13–21. Even while discussing with CHS the possibility of first-to-file issues, O'Connell consistently told CHS's attorneys that once the Government intervened, all of the Relators were entitled to attorneys' fees as a matter of law. Hrg. Tr. 409:7–22. O'Connell clearly recalled that, during those discussions, CHS never stated it was going to refuse to pay fees for anyone who was not allocated a relator's share. Hrg. Tr. 376:22–377:21.

(R. & R. at 31.)

### iii.    David Garrison [Co-counsel for the *Doghramji* Relators]

The Court finds that Garrison's testimony further illuminates the dynamics among the Relators and with the Government, and is consistent with testimony given by the other Relators' attorneys, as well as that of the former Government attorney, Thomas. Of particular note is Garrison's testimony that he only communicated with the Government, and never directly with counsel for CHS, regarding language of the settlement agreement. Hrg. Tr. 449:7–10. Garrison also testified, consistent with Thomas' testimony, that the Government unilaterally decided which of the edits proposed by the Relators would be conveyed to CHS. Hrg. Tr. 449:23–450:23. *See also* Hrg. Tr. 20:17–20 (Thomas).

Undisputedly, the Relators' attorneys were not acting as co-counsel for the entire group of Relators. Hrg. Tr. 459:4–6. Garrison testified that he was unaware of many of the communications between other Relators or with CHS prior to the instant litigation. Hrg. Tr. 464:9–466:7. In fact, the undercurrent driving the Relators' interactions with other parties and with each other was the understanding that if the cases were not settled, litigation would follow and the interests of the Relators would diverge. Hrg. Tr. 460:4–11. For that reason, the primary concern of each Relator's attorney was the outcome for that Relator, and communications between a Relator and the Government or with CHS were often not even reported to the entire group of Relators. Hrg. Tr. 459:7–19, 460:12–19.

(R. & R. at 32.)  However, Garrison acknowledged that the *Doghramji* Relators did receive some communications from CHS through the Government.  Garrison testified that he received and read the email from Waldman, forwarded to Relators' counsel by the Government, that included CHS's revisions to the Settlement Agreement and "ma[de] clear that . . . CHS [wa]s preserving its rights to object to the various relators' claims for attorneys['] fees."  Hrg. Tr. 494:10–495:4 (referring to JEX 53); *see also* Hrg. Tr. 519:7–520:11 (interpreting Waldman's email to mean CHS was preserving rights to challenge the reasonableness of, but not entitlement to, attorneys' fees).  Garrison did not call Waldman or otherwise communicate with him or any other Relator's counsel the sentiment that CHS's Settlement Agreement revisions continued to bar CHS from challenging Relators' eligibility to attorneys' fees.  Hrg. Tr. 495:1–16.[22]

> Garrison confirmed, however, that once an agreement was reached with the Government for intervention, the Relators had some measure of confidence that fees would be paid, with any remaining litigation only as to amount. Hrg. Tr. 470:3–20, 472:4–11.  For that reason, CHS's requests for attorney time records was viewed as a precursor to possible objections to reasonableness of fees, not a signal that CHS intended to object to the Relators' entitlement to fees, Hrg. Tr. 477:22–478:7.  CHS did nothing to dispel that view, even after Garrison sent fee information reciting the bases for the Tennessee Relators' entitlement to fees. Hrg. Tr. 477:1–6.  Garrison also echoed the testimony of Kreindler and O'Connell that until the instant litigation ensued, he was never advised by CHS, the Government, or any other Relator's attorney that CHS did not intend to pay fees to any relators other than those who received a part of the relator's share. Hrg. Tr. 460:24–461:13.

(R. & R. at 33.)

---

[22] On cross-examination, Garrison disagreed with the characterization that he did not write his interpretation of the Settlement Agreement "to anybody on the face of the planet." Hrg. Tr. 495:14–16.  The Magistrate Judge understood Garrison to mean that he could recall no non-privileged communication in which he wrote down his view that the agreement barred eligibility challenges to fees, while he neither confirmed nor denied the existence of a privileged communication to that effect.  Hrg. Tr. 499:6–15.  She also suspected that if any such communication did exist, "it surely would have been produced subject to assertion of privilege" because it "would do nothing but help [Relators'] cause" in this matter.  Hrg. Tr. 500:13–501:5.

### c.    CHS

The testimony of CHS's attorney, Michael Waldman, also essentially mirrored the arguments made by CHS in this litigation. Waldman confirmed that as early as March of 2014, CHS contemplated issues about attorneys' fees, including eligibility grounds. Hrg. Tr. 195:20–196:4 and JEX 6. Waldman also testified he believed that CHS's intention to challenge the Relators' entitlement to fees was made clear throughout finalization of the settlement. Hrg. Tr. 193:19–194:3. He further relied on the June 26 email exchange with Organ and other counsel for Relators Reuille, Cook-Reska, and Plantz (JEX 66) as fully apprising the Relators that CHS intended to challenge attorneys' fees on first-to-file grounds. Hrg. Tr. 214:16–22. Additionally, Waldman testified to a conversation with O'Connell in June (as described in JEX 61) in which Waldman confirmed that if CHS were unable to settle, it intended to litigate attorneys' fees, including on eligibility grounds. Hrg. Tr. 228:1–19. While Waldman testified that he expected there was "sort of a free flow of information between the relators, one relator to other relators and to the government" (Hrg. Tr. 229:16–20), the evidence does not support that every conversation between CHS and any Relator or CHS and the Government was shared among the entire group of Relators.

Waldman acknowledged during his hearing testimony that, from the earliest days of the settlement negotiations, the Relators affirmatively conveyed their position that the settlement entitled all of them to recover their reasonable attorneys' fees. Hrg. Tr. 276:10–277:11. This position was articulated in Recital G to the Settlement Agreement. Even though CHS included a recital disputing the substantive fraud claims, no language or separate recital disputing Relators' entitlement to attorneys' fees was included in the Settlement Agreement. Hrg. Tr. 277:12–278:18.[23] . . . Waldman further acknowledged that CHS requested and received billing records from the Relators, but never directly alerted the Relators to CHS's intended challenge to the Relators' eligibility for attorneys' fees. Hrg. Tr. 297:10–301:7, 308:25-311:1, 312:5-313:9.[24]

In addressing the forum selection exception, Waldman described the clause as neutral, with venue determinations to be left to the district court in each district in which the original qui tam complaint was filed (Hrg. Tr. 219:9–2[5]). . . . CHS[] acknowledged [a] concern about the possibility of conflicting court determinations of eligibility issues. Hrg. Tr. 289:20–290:23 (Waldman indicating that CHS did

---

[23] Waldman explained that CHS did not, as a general matter, take the recitals very seriously, except for CHS's decision to rebut the Government's assertion that CHS had committed fraud with a counter-recital denying CHS's liability. Hrg. Tr. 243:18–244:17. While CHS considered it important "from a public relations standpoint" to deny liability, "there wasn't the same need for a response to the claim for attorneys' fees." Hrg. Tr. 244:10–15.

[24] Likewise, Waldman asserted that Relators never communicated to CHS their belief that Term 8 as edited by CHS had the same legal effect as Term 2, which CHS had deleted. Hrg. Tr. 211:15–212:5, 238:24–239:5.

not want "one judge say[ing] that one relator was first-to-file and another judge . . . say[ing] that another relator was the first-to-file . . .")." [Waldman also stated his belief that the "Settlement Agreement was intended to carve out these issues." Hrg. Tr. 290:6–7.] . . . . [D]espite this crucial concern, CHS offered no provision in the Settlement Agreement describing how the supposedly neutral venue provision would be applied, nor for which law would control any litigation over first-to-file or other recoverability issues, even though cases were pending in at least three different federal judicial circuits. Hrg. Tr. 290:17–29[1]:14. Moreover, no evidence was offered that CHS's interpretation of this [venue] provision[] was conveyed to the Relators prior to finalization of the Settlement Agreement.

Waldman also asserted that CHS's goal in Term 8 was to allow for the broadest preservation of rights, and that listing specific matters reserved "was likely to be subject to criticism" if something was forgotten. Hrg. Tr. 245:4–18. He also testified that drafting the specifics of a broad reservation was too difficult because of various relator-specific issues. Hrg. Tr. 245:19–246:6. However, Waldman acknowledged that the specific reservations made by the Government in the Settlement Agreement included all bars to relators. Hrg. Tr. 272:7–9. Waldman further admitted that general releases, including the one in the Settlement Agreement, are typically inclusive of "as many things . . . as possible," so that everything is on the table, and that Term 8 could have included the same broad descriptive language as the general release in the Settlement Agreement. Hrg. Tr. 273:4–23.

(R. & R. 33–35.)

## IV.  REPORT AND RECOMMENDATION'S FINDINGS

Reviewing all the evidence above, the Magistrate Judge found "very little in the extrinsic evidence that illuminates the parties' original understanding of Term 8." (R. & R. at 35.) She concluded that all parties understood some level of uncertainty about the scope of the attorneys' fee carve-out. (*Id.*)  The Magistrate Judge identified no evidence that CHS communicated its intention to preserve post-settlement fee eligibility challenges to all Relators; instead, CHS only communicated this intention obliquely to the Government or to individual groups of Relators. (*Id.* at 36.)  Ultimately, the Magistrate Judge found that CHS obscured whether it intended to challenge the recoverability of Relators' attorneys' fees and "bait[ed] Relators with a poorly worded, ambiguous reservation of rights only to switch to a definite and certain explanation of that reservation once the Settlement Agreement was executed." (*Id.* at 36–37.)  CHS, she

reasoned, left a "fertile field" to cultivate Relators' understanding that challenges to fee eligibility were off the table, including by failing to disabuse Relators of their frequent claims to entitlement to fees; failing to counter Recital G, in which Relators asserted their entitlement to fees in the Settlement Agreement; acquiescing to the venue carve-out for attorneys' fee disputes; and failing to respond to point-blank questions from Relators' counsel about CHS's substantive intentions regarding attorneys' fees. (*Id.* at 37–39.)

Because the Magistrate Judge found the extrinsic evidence amounted to "the illusion of mutual assent" as to Term 8, she turned to other interpretive principles to give meaning to the provision and ultimately found for Relators. (*Id.* at 42–43.) The Magistrate Judge determined that the Relators consistently manifested their intent for entitlement to fees, while CHS did not manifest its intent to challenge Relators' entitlement. (*Id.* at 44–45.) The Magistrate Judge concluded that the manifestations of intent favored Relators' interpretation of Term 8, such that CHS failed to preserve any challenges except to the reasonableness of Relators' attorneys' fees. (*Id.*) The Magistrate Judge also found that evidence of industry parlance—as derived from the evidentiary hearing witnesses' inability to name any other "instance of a defendant raising first-to-file or public disclosure eligibility challenges" post-settlement—favored Relators' interpretation. (*Id.* at 46.)

Two other interpretive tools played a role in the Magistrate Judge's analysis. First, under Restatement (Second) of Contracts § 204, which applies when the parties to a contract "have not agreed with respect to a term which is essential to a determination of their rights and duties," the Magistrate Judge reasoned that the Court could supply words to Term 8 that would expressly limit CHS's ability to challenge Relators' attorneys' fees to objections "on reasonableness grounds" only. (*Id.* at 47.) Second, because CHS drafted the disputed language in Term 8, the Magistrate Judge applied a tie-breaker rule to interpret contracts against the drafter of doubtful

language.  (*Id.* at 48–49.)  However, other language in the Settlement Agreement states that it "shall be deemed to have been drafted by all Parties . . . and shall not, therefore, be construed against any Party for that reason in any subsequent dispute."  (Settlement Agreement ¶ 18.)

## LEGAL STANDARD

As the Report and Recommendation concerns Relators' application for attorneys' fees, it is considered a dispositive matter.  When a magistrate judge issues a report and recommendation on a dispositive matter, the district court must review *de novo* any portion of the report and recommendation to which a specific objection is made.  Fed. R. Civ. P. 72(b); 28 U.S.C. § 636(b)(1); *United States v. Curtis*, 237 F.3d 598, 603 (6th Cir. 2001); *Massey v. City of Ferndale*, 7 F.3d 506, 510 (6th Cir. 1993).

We consider this issue on general remand from the Sixth Circuit.  In reversing the prior determination of Term 8's meaning, the appellate court remanded to us "for proceedings consistent with [its] opinion."  *Cmty. Health Sys., Inc.*, 666 F. App'x at 418.  This "conforms with language [the Sixth Circuit] ha[s] previously deemed a general remand."  *Owner-Operator Indep. Drivers Assoc., Inc. v. Comerica Bank*, 562 F. App'x 312, 332 (6th Cir. 2014) (citing *United States v. Lopez*, 453 F. App'x 602, 604 (6th Cir. 2011), which found remand "for further proceedings consistent with this opinion" to be a general remand because it "contain[ed] no limiting language and is presumptively a general one").  Where a remand does not limit the district court's review, we consider the issues before us *de novo*.  *United States v. Moore*, 131 F.3d 595, 598 (6th Cir. 1997).

## ANALYSIS

At the outset of our discussion, we pause to distinguish what this opinion does and does not do.  It does not decide whether some or all Relators are ultimately entitled to attorneys' fees. It also does not decide whether the first-to-file or public disclosure bars apply to some or all

Relators' fee claims, or whether the Government's intervention in all Relators' cases entitles

Relators to reasonable attorneys' fees.  Nor does this opinion pass judgment on the public policy

implications or incentives inherent in this case, in which the Government evidently leveraged the

work of many private attorneys and law firms to perform a nationwide investigation that resulted

in a nearly $100 million return to the U.S. Treasury.  *See Cmty. Health Sys., Inc.*,

666 F. App'x at 419–20 (Stranch, J., concurring) (setting forth the "vital role" relators and

attorneys play in rooting out health care fraud and recovering public moneys);

R. & R. at 47–48 n.42 (echoing Judge Stranch's concurrence that this settlement "implicates

public policy").  Rather, our sole task is to determine "whether CHS failed to preserve its right to

challenge the entitlement of the seven relators to attorneys' fees" in the Settlement Agreement,

using the extrinsic evidence presented "to ascertain the parties' original understanding of its

terms."  *Cmty. Health Sys., Inc.*, 666 F. App'x at 411, 418.

For the reasons that follow, we hold that CHS preserved its right to challenge Relators'

entitlement to attorneys' fees in Term 8 of the Settlement Agreement.

## I.   JURISDICTION

We first address a jurisdictional argument raised by CHS.  *Tenet v. Doe*, 544 U.S 1, 6 n.4,

125 S. Ct. 1230, 1235 n.4 (2005) (courts must address "questions pertaining to its jurisdiction

before proceeding to the merits"); *Himmelreich v. Fed. Bur. of Prisons*, 766 F.3d 576, 579

(6th Cir. 2014) ("[I]n the absence of jurisdiction, the court lacks the power to enter judgment.").

CHS contends that the first-to-file and public disclosure bars are jurisdictional, and since a

federal court can never waive subject matter jurisdiction, these are essentially non-waivable

defenses.  (Mem. at 12.)

The Magistrate Judge found CHS's view to be "irreconcilable with the Sixth Circuit's

findings" in remanding this case.  (R. & R. at 9.)  The Sixth Circuit characterized Term 8's first

sentence as "effectuat[ing] a broad waiver of CHS's ability to raise 'any and all manner of claims, controversies, actions, [and] causes of actions . . . arising out of the agreement or imposed by statute,'" while the second sentence "limits the scope of that waiver" by allowing CHS to reserve the right to challenge Relators' claims to attorneys' fees. *Cmty. Health Sys., Inc.*, 666 F. App'x at 417 (quoting Settlement Agreement ¶ 8). The Sixth Circuit then found that "the first sentence in Term 8 operates to waive CHS's ability to challenge the . . . Relators' entitlement to attorneys' fees under the first-to-file and public disclosure rules *unless* the second sentence in Term 8 preserves CHS's ability to raise these challenges." *Id.* The Sixth Circuit also stated that if Relators' interpretation of the Settlement Agreement is correct, "then CHS is precluded from making a first-to-file challenge." *Id.* at 418. In remanding the case to us to consider extrinsic evidence of Term 8, the Sixth Circuit held Relators' interpretation was one of two reasonable readings of the scope of the reservation in that clause. *Id.* Based on this language, the Magistrate Judge ruled that the "Court is constrained by the Sixth Circuit's determination that CHS waived any first-to-file and public disclosure objections to the Relators' fees, *unless* CHS can establish through extrinsic evidence that those challenges were preserved." (R. & R. at 10.)

CHS urges a ruling that first-to-file and public disclosure defenses are jurisdictional and, thus, can never be waived. (Mem. at 11–13.) CHS further argues that the law of the case doctrine and mandate doctrines are no impediment to ruling on subject matter jurisdiction for jurisdictional issues that were never raised before the appellate court. (Reply (Dkt. No. 298) at 3.) Relators agree with the Magistrate Judge's finding and argue that to hold otherwise would run afoul of the letter and spirit of the Sixth Circuit's decision on appeal. (Resp. (Dkt. No. 294) at 5, 8.)

When the appellate court remands a case to the district court for further proceedings, "the trial court must 'proceed in accordance with the mandate and the law of the case as established on appeal.' The trial court must 'implement both the letter and the spirit of the mandate, taking into account the appellate court's opinion and the circumstances it embraces.'" *United States v. Moored*, 38 F.3d 1419, 1421 (6th Cir. 1994) (quoting *United States v. Kikumura*, 947 F.2d 72, 76 (3d Cir.1991)); *see also Westside Mothers v. Olszewski*, 454 F.3d 532, 538 (6th Cir. 2006) (same).

The Magistrate Judge rightly found CHS's interpretation to be "irreconcilable" with the mandate of the Sixth Circuit. (R. & R. at 9.) Both the letter and the spirit of the Sixth Circuit's opinion demand a ruling that CHS *may* waive first-to-file and public disclosure defenses, leaving only the only question of whether they *did*. The Sixth Circuit twice stated explicitly that it is possible for CHS to have waived its asserted defenses. *Cmty. Health Sys., Inc.*, 666 F. App'x at 417 (stating the first sentence of Term 8 waives these defenses "*unless* the second sentence in Term 8 preserves CHS's ability to raise these challenges"); *id.* at 418 ("if Tennessee Relators' interpretation [of Term 8] is correct, then CHS is precluded from making a first-to-file challenge"). Beyond these express statements, the Sixth Circuit remanded the case for examination of extrinsic evidence to determine the meaning of Term 8. *Id.* at 418. That whole exercise would have been unnecessary if the first-to-file and public disclosure defenses were non-waivable as a matter of law. The task before us is to interpret the scope of a contractual agreement between the parties, not to decide whether Relators' claims for fees are barred by either statutory defense CHS wishes to assert.

Accordingly, we reject CHS's jurisdictional objection and proceed to the merits.

## II.     THE MEANING OF TERM 8

We come now to the heart of the matter: Whose meaning of Term 8 controls?  Among its many objections, CHS argues that the Magistrate Judge erred in finding that the parties lacked mutual assent as to Term 8 or, even if the parties attached different meanings to Term 8, the Magistrate Judge erred in finding that CHS knew of Relators' interpretation.  (Mem. at 22–34.) After a careful review of the Report and Recommendation, the extrinsic evidence, and the parties' briefs, we conclude that CHS is correct and, therefore, that CHS's meaning must prevail.

Federal common law controls the release of a federal cause of action.  (R. & R. at 43 (citing *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1481 (6th Cir. 1989).)  "Federal common law is generally based on the prevailing view among the states."  *LaBelle Mgmt., Inc. v. Great-W. Life Assur. Co.*, No. 99 C 10469, 2001 WL 1924620, at *1 (E.D. Mich. Oct. 24, 2001) (citing *Cent. States, Se. & Sw. Areas Health & Welfare Fund v. Pathology Labs. of Arkansas, P.A.*, 71 F.3d 1251, 1254 (7th Cir. 1995)); *see also Gamewell Mfg., Inc. v. HVAC Supply, Inc.*, 715 F.2d 112, 116 (4th Cir. 1983) (deriving federal common law from "the best-reasoned decisions in the general common law development of the subject").  "These prevailing views are in turn distilled primarily from the American Law Institute's Restatements of the Law and treatises."  *LaBelle Mgmt.*, 2001 WL 1924620, at *1 (citing cases).  The Restatement (Second) of Contracts (1981) (hereinafter "Second Restatement" or "2d Restatement") is a prime common law guide in interpreting the scope of a release of a federal action.  *Street*, 886 F.2d at 1481 (endorsing use of the Second Restatement in holding that "the federal common law of release . . . at a minimum adopts the standards of Restatement of Contracts 2d § 173 concerning contracts between parties having a fiduciary relationship"); *see also Anderson v. United States*, 344 F.3d 1343, 1353 n.4 (Fed. Cir. 2003) (relying upon the Second Restatement and remarking

that "[i]t is well settled by long-standing precedent that the common law of contract" governs federal contracts). We therefore look to the Second Restatement to guide our analysis.

To be operative, a contract requires manifestation of mutual assent. 2d Restatement § 17(1); *see United States v. Robison*, 924 F.2d 612, 614 (6th Cir. 1991) ("There can be no contract without a 'meeting of the minds.'" (quoting 2d Restatement § 17 cmt. c)). There is no mutual assent if the parties attach materially different meanings to their manifestations and both parties know of the other party's meaning, or neither party knows of the other party's meaning. 2d Restatement § 20(1). In such a circumstance, the contract (or a term, if the contract is otherwise formed and performed) fails. *See* 5 Corbin on Contracts § 24.5 (2019) (when mutual assent fails, "either no contract has been formed, or if a contract has been formed through mutual assent to other terms, the disputed term is not included"). However, when one party is aware or has reason to know of the second party's meaning, and the second party does not know and has no reason to know of the first party's meaning, the second party's interpretation will prevail. 2d Restatement § 20.

In this dispute, Relators[25] purport to have attached a materially different understanding to the scope of the reservation in Term 8 than CHS. (*See* Resp. at 27.) CHS argues that Relators in fact attached the same meaning as CHS to Term 8 when the Settlement Agreement was executed. (Mem. at 22.) CHS also argues that, even if Relators attached a different meaning to Term 8, the Magistrate Judge erred in finding that CHS had reason to know of Relators' understanding of the

---

[25] As Relators' counsel conducted all settlement negotiations, this analysis refers to "Relators" and "Relators' counsel" interchangeably in discussing the meaning they attached to Settlement Agreement provisions. However, because each relator was a different contracting entity, we specify when individual relators or their counsel are involved in separate communications. *See* 12 Williston on Contracts § 36:1 (4th ed. 2019 update) (when a contract creating separate obligations is "entered into by two or more parties in one instrument, it is the same as though each has executed separate instruments," and "each party is bound separately for the performance which it promises and is not bound jointly with anyone else").

provision.  (*Id.* at 33.)  Section 201 of the Second Restatement supplies the proper analysis for

this situation, and reads as follows:

> (1) Where the parties have attached the same meaning to a promise or agreement
> or a term thereof, it is interpreted in accordance with that meaning.
>
> (2) Where the parties have attached different meanings to a promise or agreement
> or a term thereof, it is interpreted in accordance with the meaning attached by one
> of them if at the time the agreement was made
>
>> (a) that party did not know of any different meaning attached by the other, and
>> the other knew the meaning attached by the first party; or
>>
>> (b) that party had no reason to know of any different meaning attached by the
>> other, and the other had reason to know the meaning attached by the first party.
>
> (3) Except as stated in this Section, neither party is bound by the meaning attached
> by the other, even though the result may be a failure of mutual assent.

2d Restatement § 201; *see United States v. Stuart*, 489 U.S. 353, 367 n.7,

109 S. Ct. 1183, 1191 n.7 (1989) (referring to the result called for in Second Restatement

§ 201(2)(b) as "hornbook contract law"); *In re AmTrust Fin. Corp.*, 694 F.3d 741, 756

(6th Cir. 2012) (citing § 201 and  asserting that "hornbook law holds that the intent of both

parties to a contract is relevant to construing its terms").

When applying Second Restatement § 201, a court must determine what meaning each

party gave to a disputed term at the time of contracting, and whether, at that time, either party

knew or had reason to know of the meaning attached by the opposite party.  5 Corbin on

Contracts § 24.5 (2019); Farnsworth on Contracts § 7.10 (4th ed. 2019 Supp.) ("resolution of the

dispute begins . . . with the meanings attached by each party at the time the contract was made").

If both CHS and Relators gave the same meaning to Term 8's scope, we are bound to give effect

to that meaning.  2d Restatement § 201(1); *Russell v. Citigroup, Inc.*, 748 F.3d 677, 681

(6th Cir. 2014) (asserting that "common understanding fixes the meaning of the contract" (citing

2d Restatement § 201(1)).  If CHS and Relators attached different meanings to Term 8, CHS's

meaning will control if CHS did not know or have reason to know of Relators' meaning, and Relators knew or had reason to know of CHS's meaning. 2d Restatement §§ 201(2)(a)–(b). We look to the parties' objective manifestations of intent in determining whether each party knew or had reason to know of the other's meaning. *Cent. States, Se. & Sw. Areas Pension Fund v. Melody Farms, Inc.*, 969 F. Supp. 1034, 1041 (E.D. Mich. 1997); 2d Restatement § 212 cmt. d ("[T]he relevant intention of a party is that manifested by him rather than any different undisclosed intention.").

The parties' outward manifestations when negotiating the Settlement Agreement reveal that Relators either shared, knew of, or had reason to know of CHS's understanding of Term 8, while CHS neither knew nor had reason to know of Relators' asserted interpretation. CHS, for its part, communicated that it intended to preserve eligibility challenges. Among other actions, CHS struck Term 2, which would have affirmatively entitled Relators to their reasonable attorneys' fees, and replaced it with the reservation in Term 8, along with a comment, forwarded to all Relators' counsel by the Government, that the change "makes clear that . . . CHS is preserving its rights to object to the various relators' claims for attorneys['] fees." (JEX 53 at 293.) Following this alteration, several communications among Relators evince an understanding that the Settlement Agreement did not prevent CHS from challenging their eligibility to attorneys' fees. (*E.g.*, JEX 54 at 929; JEX 61 at 333; JEX 66 at 1213–14.) CHS also asserted its view that Relators who were not first to file would not be entitled to attorneys' fees in communications to several Relators' counsel. (*E.g.*, JEX 64 at 1208.) On the other hand, we can find no evidence that Relators communicated an understanding during negotiations that CHS waived eligibility challenges through the language of Term 8 or elsewhere in the Settlement Agreement. Neither Relators' briefs nor their testimony point us to convincing evidence of such outward manifestations. CHS therefore neither knew nor had reason to know of Relators'

purported understanding that Term 8 preserved only challenges to the reasonableness, but not recoverability, of Relators' attorneys' fees. Accordingly, whether we apply Second Restatement §§ 201(1), (2)(a), or (2)(b), CHS's interpretation of Term 8 controls.

In so concluding, we depart from the Magistrate Judge's analysis that Term 8 suffered from a "mirage of mutual assent." (R. & R. at 13.) We cannot find that Relators communicated to CHS during negotiations the understanding of Term 8 that they now assert in post-settlement litigation, nor can we find that Relators did not know or have good reason to know of CHS's intent to preserve all available challenges to attorneys' fee claims.[26]

### A. Relators Shared CHS's Understanding of Term 8

The Report and Recommendation observes that, as of May 2014, "[t]here is little doubt that the Relators . . . recognized at least the possibility that CHS might make some attempt to avoid paying all of Relators' attorneys' fees." (R. & R. at 19–20.) The Magistrate Judge reasons that "simply recognizing a possible outcome does not compel a finding that the Relators' interpretation fails," because "the Relators attempted to clarify the extent to which the possibility might become a reality; attempts that were deliberately rebuffed by CHS." (R. & R. at 20 n.18.) In particular, the Magistrate Judged placed "great weight" on evidence that CHS refused to give a substantive response to Relators regarding its intentions to raise fee eligibility defenses when specifically asked on the eve of settlement. (*Id.* at 45.)

---

[26] Large portions of the parties' briefs assume a failure of mutual assent. (*See* Mem. at 13–22; Resp. at 8–26.) In particular, both parties argue extensively over whether and how to apply *United Steelworkers of Am. v. N. Bend Terminal Co.*, 752 F.2d 256, 261 (6th Cir. 1985), which held that "where there is a mutual misunderstanding as to a contract term," a contract has otherwise been formed and performed, and the court cannot supply a term, "the court will rule against the party bearing the burden of proof." (Mem. at 14–18; Resp. 11–16, 22–26; Reply at 4–8.) Because we find that there was either mutual assent or, at least, no mutual misunderstanding as to Term 8, these analyses are inapposite.

CHS argues that the Magistrate Judge erred by concluding that, "for there to have been a meeting of the minds, Relators had to have understood not only what defenses Term 8 *permitted* CHS to advance, but also whether CHS *would* in fact advance such defenses." (Mem. at 23.) CHS contends that once the Magistrate Judge acknowledged that Relators recognized that CHS might raise eligibility defenses, she "should have stopped right there." (*Id.*)

We agree with CHS. The relevant inquiry is not what CHS ultimately intended to do, but whether the parties understood what CHS was permitted to do under the Settlement Agreement. Thus, while we likewise place considerable weight on the evidence emphasized by the Magistrate Judge, (*see* R. & R. at 45), we find that evidence supports the opposite inference. Substantial extrinsic evidence from the settlement negotiation period demonstrates that Relators shared CHS's understanding that Term 8 did not bar CHS from asserting eligibility challenges. Relators, by communicating among themselves and to CHS that they understood the possibility that CHS might raise these defenses, implicitly admitted that CHS had the option to do so under the language of the Settlement Agreement.

Communications among Relators and with the Government indicate Relators' understanding that the Settlement Agreement as executed did not waive CHS's fee eligibility defenses. On June 10, 2014, directly after CHS struck Term 2 and added the now-disputed reservation in Term 8, Buschner, co-counsel for the *Doghrami* Relators, wrote to the other Relators' counsel, "As to CHS not agreeing to pay us fees, I assumed that would be the case." (JEX 54 at 929.) On June 23, O'Connell, representing (with Soifer) relators Cook-Reska and Reuille, emailed Handrigan, the Government attorney, that attorneys' fee issues would need to be "handled after the settlement" because CHS was "already making noises about claiming first to file challenges to fees." (JEX 61 at 333.) On July 8, Kreindler, representing relator Bryant, wrote to the full group of Relators' counsel, "The deafening silence [regarding CHS's intentions

as to attorneys' fees] makes me think they are waiting for the settlement to be finalized so they can use it as a sword against at least 5 of the relators' claims for fees." (JEX 79 at 746.) Kreindler confirmed during the evidentiary hearing that the five relators to which he referred were those he believed could be vulnerable to a first-to-file challenge. Hrg. Tr. 156:8–16. When Osman (representing relator Mason) suggested in response that Relators refuse to sign the agreement "until CHS commits to payment of attorneys['] fees for all Relators, subject to proof of time spent, reasonableness, etc.," Buschner replied that she had "been involved in many settlements where the attorneys' fees issue was not resolved before the settlement," and counseled moving forward because "it would be a disaster" if the presiding judge got wind that Relators were holding up the settlement over attorneys' fees. (JEX 81 at 754.) On July 9, Organ emailed Kreindler, Soifer, and O'Connell to report a conversation with the Government in which he learned that "CHS is absolutely going to fight about fees and won't agree to the language I proposed before." (JEX 84 at 469.) O'Connell testified that he understood "the language [Organ] proposed before" to refer to Term 2, the now-deleted provision that would have obligated CHS to pay Relators' reasonable fees. Hrg. Tr. 436:5–7. In that same email, Organ further framed the issue as "whether to refuse to sign without language pursuant to which CHS agrees to pay our fees, subject to a reasonableness determination." (JEX 84 at 469.)

In none of these exchanges do Relators suggest that CHS cannot challenge their entitlement to fees; they were instead actively worried about that possibility weighed against the time pressure of the negotiations. Buschner was seemingly unsurprised that CHS did not agree to pay Relators' attorneys' fees subject to a reasonableness determination but urged signing the

agreement anyway. (JEX 54, 81.)[27] Kreindler's inkling that CHS *could*, under the terms of the Settlement Agreement, assert a first-to-file challenge is strong evidence that he knew that CHS did not intend to waive this challenge. (JEX 79 at 746.) All other Relators were aware of this view as recipients of Kreindler's email exchange. (*Id.*) Relators have not identified any written record asserting the view that the Settlement Agreement barred eligibility challenges, and no Relator's counsel could recall specifically communicating this view to any other counsel. *See* Hrg. Tr. 133:6–16, 159:21–25, 167:15–19, 168:6–9, 436:20–437:4, 495:1–16.[28]

In addition, communications between Relators' counsel and CHS demonstrate that Relators likely shared CHS's understanding of Term 8. Organ emailed CHS attorneys Waldman and Sauber to assert that "Relators are entitled to their reasonable expenses, attorneys' fees and costs" and "[a]ccordingly," to object to CHS's deletion of Term 2, without which Organ said Relators would "need to revisit the language in the settlement agreement." (JEX 63 at 1206.) In a further exchange, Organ even contemplated a "multi-jurisdictional battle" over first-to-file challenges under the terms of the Settlement Agreement (including the reservation in Term 8) as then drafted and ultimately executed. (JEX 66 at 1213–14.) Organ again pressed CHS, "If you are not willing to [negotiate the reasonableness of Relators' attorney fees] because we will not

---

[27] Garrison, co-counsel for the *Doghramji* Relators, testified that he did not believe the Settlement Agreement allowed CHS to challenge recoverability of fees. *See* Hrg. Tr. 493:2–14. But as CHS points out, it appears Buschner played the active role in negotiating the settlement for the *Doghramji* Relators. (Mem. at 27, 28 n.27.) Garrison, by his own admission, had no experience in multi-relator settlements and deferred to Buschner's firm for their assessments of how the settlement should be structured. Hrg. Tr. 469:21–470:2.

[28] Regarding Garrison's refusal to agree that he did not communicate this view "to anybody on the face of the planet," and the Magistrate Judge's assumption that any such communication would have been produced because it "would do nothing but help [Relators'] cause" at this stage of the case, *see supra* n.22. The only other indication among Relators that they communicated this view orally to another relator's counsel was that Kreindler "might have" done so, but he could not recall specifics. Hrg. Tr. 160:1–6.

identify which of our clients is 'first to file,' then we will have to revisit the language in the settlement agreement we are being asked to sign." (*Id.* at 1214.) But Relators never did revisit the language. O'Connell testified that he reviewed and approved Organ's latter email before it was sent to CHS. Hrg. Tr. 428:2–11. Although O'Connell did not believe CHS would be legally justified in bringing a first-to-file challenge, he understood the possibility that CHS planned to do so. Hrg. Tr. 428:17–19.

Indeed, by directly asking CHS how they intended to handle attorneys' fees, Relators evinced an understanding that CHS could challenge their eligibility to those fees. On the eve of settlement execution, Kreindler corresponded with Sauber regarding CHS's substantive position on attorneys' fees. (JEX 86, 91.) Kreindler later testified that he posed these questions to CHS because he "wanted to know in more detail what that decision was going to be; were they thinking our fees were unreasonable. . . *did [CHS] think I wasn't entitled to receive my fees*. I wanted a more definitive response." Hrg. Tr. 119:4–8 (emphasis added).

The best interpretation of the foregoing communications is that Relators shared CHS's understanding that the Settlement Agreement as executed allowed CHS the option to assert fee eligibility challenges.

Relators argue that such a conclusion misconstrues the Report and Recommendation. (Resp. at 28.) Relators suggest that their "acknowledgement" of the possibility that CHS may try to avoid paying attorneys' fees came when Relators were considering not just signing the agreement, but also the chance that there would be no agreement at all. (*Id.*) Certainly, the Report and Recommendation's discussion that Relators "recognized at least the possibility that CHS might make some attempt to avoid paying all of Relators' attorneys' fees" involved communications that occurred before CHS deleted Term 2. (R. & R. at 19–20.) But Relators' argument ignores their many communications *after* CHS struck Term 2 and added language to

Term 8 in which they expressly recognized CHS's interest in asserting first-to-file challenges under the terms of the agreement as executed.

Most fundamentally, the fact that Relators considered not signing the agreement unless CHS agreed to pay their fees, subject to a reasonableness determination, contradicts Relators' argument that Term 8 accomplishes the same thing by confining CHS to reasonableness challenges alone. Relators have argued throughout this phase of the litigation that the Settlement Agreement essentially entitles them to fees, subject to a court determination that their fees are reasonable. (*See* Resp. at 3 ("Relators . . . assert that Term 8 limits CHS to challenging or objecting only to the reasonableness of the attorneys' fees requested."); Dkt. No. 277 at 5 (Relators' post-hearing brief arguing that Term 8 "reserved [CHS's] right to dispute only the *reasonableness* of Relators' requested fees," but not other challenges to eligibility for fees).)

But multiple Relators' counsel debated whether to refuse to sign the Settlement Agreement as written unless it guaranteed attorneys' fees subject to a reasonableness determination. When counsel for one relator suggested, on July 8, that they "not sign until CHS commits to payment of attorneys['] fees for all Relators, subject to proof of time spent, *reasonableness*, etc.," Buschner replied that it would be a "disaster" to hold up the settlement over fees, recounted her many previous cases in which attorneys' fees were dealt with post-settlement, and counseled Relators to "get this thing signed and move on." (JEX 81 at 754 (emphasis added).) After Organ emailed Kreindler, O'Connell, and Soifer that "CHS is absolutely going to fight about fees and won't agree to the language" in the now-deleted Term 2, Kreindler replied, "I don't mind signing off on the agreement, but I think we are entitled to know where things stand on all the outstanding issues." (JEX 85 at 427.) Once Kreindler asked CHS and never got an answer, (JEX 86, 91), he and the other Relators signed the agreement anyway.

We cannot reconcile Relators' position before execution with their position in the current litigation. Beforehand, Relators' counsel considered not agreeing to the settlement as drafted unless CHS affirmatively agreed to pay fees, subject to a reasonableness challenge. They now argue that the settlement agreement as executed entitles Relators to fees, subject only to a reasonableness challenge. These arguments cannot be squared with one another.

In sum, the extrinsic evidence of the parties' negotiations reveals that Relators understood that CHS was permitted to challenge their entitlement to attorneys' fees under the Settlement Agreement. Despite recognizing this possibility, Relators signed the agreement without alteration. No one disputes that CHS shared this understanding of its rights under the agreement. "Where parties have attached the same meaning to a promise or agreement or a term thereof, it is interpreted in accordance with that meaning." 2d Restatement § 201(1).

### B.    Relators Knew or Had Reason to Know of CHS's Understanding

Even if we found that Relators did not share CHS's interpretation of their rights under the Settlement Agreement, the evidence recounted above establishes that they knew of CHS's position. Multiple communications also show that Relators had reason to know of CHS's position.

CHS's removal of Term 2 and addition of the disputed language in Term 8 alone should have put Relators on notice of CHS's intent to preserve fee eligibility challenges. Term 2 had expressly stated that "CHS agree[d] to pay to Relators their reasonable expenses, attorneys' fees and costs." (JEX 43 at 486.) Removing this provision meant the Settlement Agreement no longer affirmatively entitled Relators to their reasonable attorneys' fees. *See* Hrg. Tr. 518:3–22 (*Doghramji* Relators co-counsel Garrison testifying that the Settlement Agreement did not contractually obligate CHS to pay reasonable fees after the removal of Term 2); 201:8–18 (Waldman confirming that CHS would have waived fee eligibility challenges if Term 2 had

survived). When CHS made these changes, Waldman communicated them to the Government with a cover email that stated the edits "make[] clear that . . . CHS is preserving its rights to object to the various relators' claims for attorneys' fees." (JEX 50 at 886.) The Government then forwarded Waldman's email and CHS's Settlement Agreement alterations to all Relators' counsel, flagging that the "language related to attorneys' fees" was one of two issues outstanding. (JEX 53 at 292.) Although Relators' counsel variously testified at the evidentiary hearing that they either did not consider the edits to be a substantive change, *see* Hrg. Tr. 108:13–15 (Kreindler); Hrg. Tr. 381:23–382:7 (O'Connell), did not read Waldman's cover email, *see* Hrg. Tr. 144:15–145:3 (Kreindler); 418:2–419:5 (O'Connell), or read Waldman's email but did not think anything of it, *see* Hrg. Tr. 494:10–25 (Garrison), the fact remains that they all received these documents and should have had a notion of CHS's intended reservation.[29] *See Johnston v. Comm'r*, 461 F.3d 1162, 1165 & n.4 (9th Cir. 2006) (finding that tax commissioner's stated purpose in a letter accepting taxpayer's settlement offer constituted taxpayer's "reason to know" of the commissioner's intended meaning).

Several Relators' counsel also received communications, directly or indirectly, from CHS signaling an intent to challenge fee eligibility based on the first-to-file bar. Waldman directly communicated that CHS was considering first-to-file challenges to Organ, O'Connell, and Soifer on June 25, 2014. (JEX 64 at 1208.) Waldman objected to these attorneys' refusal to "identify which of your clients you believe is the first to file," and stated his belief that attorneys for clients who were not first to file "would not be entitled to recover their attorneys' fees." (*Id.*)

---

[29] We reject the suggestion that Term 8 was really Term 2 rephrased. During the evidentiary hearing, some Relators' counsel testified that the reservation in Term 8 simply moved the entitlement in Term 2 to another section of the agreement. Hrg. Tr. 108:13–15 (Kreindler); Hrg. Tr. 381:23–382:7 (O'Connell). Relators never communicated this view—to themselves, the Government, or CHS—during negotiations.

Kreindler received this entire email exchange, forwarded to him by Organ, giving him reason to know of CHS's position. (JEX 69.) (Kreindler's receipt of these emails also gave him a reason to know of Organ's stance that the Relators would have to revisit the settlement language after CHS removed Term 2. (*Id.*))[30]

Moreover, CHS never stated, in words or substance, a belief that Relators *were entitled* to fees. The Magistrate Judge found it significant that CHS failed to state that it planned to contest fee eligibility, even as CHS was collecting detailed attorney billing information from Relators' counsel. (R. & R. at 18, 39.) However, CHS never stated that it accepted Relators' eligibility for attorneys' fees. Instead, from the start and through execution of the agreement, CHS obfuscated on how, precisely, it planned to resolve attorneys' fee issues. For example, on May 13, 2014, in response to a query regarding when CHS wanted attorneys' fee information, Waldman wrote, "the sooner CHS has the fee requests with backup the sooner it can respond and hopefully resolve." (JEX 30 at 825.) And on July 9, on the eve of execution, Sauber responded to Kreindler's direct question about CHS's intentions, "We have consistently told [the Government] we will carve out the fees from the settlement and have sent them a draft doing just that. We will address these issues after the settlement is accepted." (JEX 86 at 1292.) These communications may not state specifically that CHS anticipated to assert statutory bars to fee recovery, but they do not foreclose that possibility either, and Relators should not have derived comfort from them that CHS accepted their entitlement to fees.

In addition, although the Government did not relay as much to Relators, CHS took no great pains to hide that it was interested in ascertaining which relator filed first. Thomas, the

---

[30] Although it appears that counsel for the *Doghramji* Relators did not receive either a direct or indirect communication to the same effect, the discussion in the preceding subsection indicates that Buschner understood the possibility that CHS could challenge Relators' entitlement to fees under the Settlement Agreement as executed. (*See* JEX 54 at 929; JEX 81 at 754.)

former Government attorney, testified that "CHS was clearly focused on questions about first filed and seeing the qui tam[] [complaints]," and that CHS "wanted to know who the first-to-file was." Hrg. Tr. 23:21–22, 59:24–25. Waldman testified that he assumed the Government was sharing all communications with Relators. Hrg. Tr. 229:16–20 (recounting his expectation that there was "sort of a free flow of information between the relators, one relator to other relators and to the government").

CHS's tactical evasion when communicating its ultimate intentions directly to Relators has, of course, helped lead to great confusion and a fee dispute that has taken as long to litigate as the underlying claims that settled in 2014. But no matter how dodgy CHS was about its intent to actually litigate eligibility challenges, the extrinsic evidence makes clear that CHS communicated its intent to leave that option open. The evidence therefore indicates that Relators' counsel knew or had reason to know of CHS's intended meaning of the scope of Term 8's reservation.

## C.    CHS Had No Reason to Know of Relators' Understanding

The Magistrate Judge concluded that CHS had reason to know of Relators' asserted understanding that the reservation in Term 8 limited CHS to challenging only the reasonableness of Relators' attorneys' fees. (*See* R. & R. at 22, 43–44.) She found that Relators consistently manifested their belief that they were entitled to reasonable attorneys' fees in communications accompanying submission of their billing records and in Recital G of the final Settlement Agreement, in which "Relators and their counsel claim[ed] entitlement under 31 U.S.C. § 3730(d) . . . to Relators' reasonable expenses, attorneys' fees and costs." (*Id.* at 44; Settlement Agreement Recital G.) The Magistrate Judge equated these outward manifestations with Relators' "intentions about the scope of Term 8." (R. & R. at 44; *see also id.* at 39 (construing Relators' repeated questions about "CHS's substantive position on fees" as "asking

46

for CHS's intentions under the carve-out language in Term 8" and as "an express inquiry about the scope of the reservation of attorneys' fee challenges"); *accord id.* at 41 n.34.) The Magistrate Judge also concluded that Term 18 of the final Settlement Agreement, which exempted attorneys' fee disputes from the Middle District of Tennessee, the chosen forum for settlement enforcement, manifested an intent to limit Term 8's reservation to reasonableness challenges only, since litigating eligibility challenges in multiple forums risked conflicting judgments. (*Id.* at 45.) Likewise, Relators argue that their concerns with Term 8's potential ambiguity were put to rest by the unrebutted inclusion of Recital G in the executed agreement, the forum selection clause in Term 18, and CHS's requests for attorney billing records from all Relators prior to settlement. (Resp. at 29.)

CHS argues that the Magistrate Judge's findings (and Relators' arguments) rest on a "faulty inference." (Mem. at 34.) "In other words," according to CHS, "*of course*, Relators claimed entitlement to fees under the statute. But they did not convey to CHS—nor even say among themselves—that by entering into the Settlement Agreement CHS was waiving its right to contest their entitlement to fees." (*Id.*) CHS also disputes the import given to the forum selection clause. (*Id.* at 19 n.19.)

Upon review of the record, we agree with CHS. We find no evidence from either the parties' contemporaneous communications or the evidentiary hearing that Relators' counsel ever manifested their understanding of Term 8 to CHS before execution of the Settlement Agreement. Instead, Relators' counsels' consistent claims to fees emanated not from the Settlement Agreement, but from their understandings of the False Claims Act itself. For similar reasons, Recital G does not communicate Relators' understanding of CHS's right to challenge their recovery of attorneys' fees, and CHS's failure to respond to Recital G does not communicate acquiescence to Relators' claim of entitlement. Finally, the forum selection clause does not

support the inference given it by the Magistrate Judge and Relators. For all these reasons, we conclude CHS had no reason to know of Relators' asserted interpretation of the scope of Term 8.

>    1.    **Relators claimed an entitlement to fees from the False Claims Act itself, not from CHS's waiver of eligibility challenges in the Settlement Agreement.**

The Magistrate Judge found, and neither party disputes, that Relators consistently claimed entitlement to reasonable attorneys' fees during settlement negotiations. However, Relators grounded their claim to entitlement in the provisions of the False Claims Act, rather than in the language of the Settlement Agreement.

In sharing their billing records with CHS, Relators asserted that they were entitled to fees under the terms of the False Claims Act; nowhere did they mention that their entitlement derived from the contemplated Settlement Agreement. Garrison wrote to CHS on behalf of the *Doghramji* Relators on May 9, 2014, "[T]he work performed by our firms in this matter resulted in fees that are recoverable by our clients under 31 U.S.C. § 3730(d)." (JEX 27 at 553.) Organ likewise shared billing records for relators Plantz and Reuille with CHS on June 10, stating that "both Dr. Plantz and Ms. Reuille are entitled to their reasonable expenses, attorneys' fees and costs pursuant to 31 U.S.C. § 3730(d)(1)." (JEX 57 at 936.) O'Connell sent CHS a nearly identical statement for Reuille's and Cook-Reska's entitlement to fees on the same date. (JEX 59 at 1203.)

Relators evidently operated from a belief that, by virtue of the Government's intervention in and subsequent settlement of all Relators' cases, the False Claims Act entitled Relators to reasonable attorneys' fees. After Waldman called Soifer to ask for fees broken out by client, Soifer explained to him that all Relators' counsel were "working together at the behest of the [Government], working on the national case," and as such, "all [Relators' counsel] need[] our fees paid." (JEX 60 at 316 (recounting conversation via email to co-counsel).) Organ (copying

O'Connell and Soifer) further articulated this theory in an email to Waldman: "In our view, because the Government is intervening in Relators' cases, and Relators are dismissing their claims in their entirety, Relators are entitled to their reasonable expenses, attorneys' fees and costs." (JEX 63 at 1206.) After the settlement was executed and CHS started to assert first-to-file challenges more firmly, O'Connell objected, claiming that "[t]he FCA [False Claims Act] does not provide a defendant the ability to raise a first-to-file defense to the payment of attorneys' fees and expenses in successfully settled cases." (JEX 110 at 1474.) Relators' counsel held to this view in later testimony. Hrg. Tr. 377:25–378:7 (O'Connell testifying that "the way I read [§] 3730(d)(1), the statute is very clear, if the government intervenes in my case, . . . we get paid our fees, period"); Hrg. Tr. 409:20–22 (O'Connell agreeing that "by operation of law, once the government intervenes, you get your fees"); Hrg. Tr. 456:8–10 (Garrison testifying that Government intervention was "critical for us to be in a position to move for attorneys' fees under the statute"). None of these claims to entitlement have anything to do with the language of the Settlement Agreement. They emanate instead from counsels' understanding of the False Claims Act.

O'Connell had an additional reason to believe his clients, Reuille and Cook-Reska, were entitled to fees notwithstanding the language of the Settlement Agreement: he understood that his clients were the first to file, and therefore eligible for fees under the statute regardless. Hrg. Tr. 393:4–6 ("I expected CHS to realize that my clients had been found to be first-to-file, they had been allocated [a relator's share], and that we'd work out a deal."); Hrg. Tr. 411:2–7 ("Q: . . . So you had, in essence, a double-barreled argument. Your first argument was [']we're getting our fees because the government intervened as a matter of law,['] and your second barrel was [']even if that isn't right, my folks were, in fact, first-to-file[']? [O'Connell]: Right.")

Relators have identified no evidence in which they stated during settlement negotiations that Term 8 or other language in the Settlement Agreement waived CHS's ability to challenge Relators' entitlement to fees. Relators' contemporaneous communications and consistent post-hoc testimony instead reveal that they placed their confidence in the False Claims Act, not in the Settlement Agreement, to recover their reasonable fees.

### 2. Recital G does not communicate Relators' understanding of the scope of the release in Term 8.

Relators argue that Recital G was "a clear and contemporaneous statement of Relators' position." (Resp. at 33.) Certainly, Recital G is a clear statement of Relators' position that they are entitled to attorneys' fees. (Settlement Agreement Recital G ("Relators and their counsel claim entitlement under 31 U.S.C. § 3730(d) . . . to Relators' reasonable expenses, attorneys' fees and costs.").) However, Recital G is not a clear statement that CHS is barred from challenging Relators' claim to entitlement.

The Sixth Circuit stated as much in its opinion remanding this issue to us. The court declared that "if an operative section of a contract is ambiguous, 'the recitals govern the construction.'" *Cmty. Health Sys.*, 666 F. App'x at 417 (quoting 17A Am. Jur. 2d *Contracts* § 373). But the court observed that "Recital G does not expressly bar CHS from challenging relators' entitlement to fees and, accordingly, does not render Term 8 unambiguous." *Id.* While the court believed CHS's silence in response to Recital G "support[ed] Tennessee Relators' interpretation," the silence alone "d[id] not conclusively establish this interpretation." *Id.* at 418.

When asked to explain CHS's failure to counter Recital G, Waldman testified that, on the whole, CHS "didn't consider [recitals] very important" because they were not binding, operative paragraphs. (Hrg. Tr. 243:23–244:3.) CHS's one exception to that general approach concerned

50

the counter-recital CHS added, which "expressly denie[d] the allegations of the United States and Relators and denie[d] that it engaged in any wrongful conduct." (Settlement Agreement Recital F.) Waldman explained, "[T]he government was accusing CHS of overcharging it, . . . of fraud. And our client understandably wanted a denial in the recital . . . that it could point to from a public relations standpoint. . . . [T]here wasn't the same need for a response to the claim for attorneys' fees." (Hrg. Tr. 244:6–15.) The Magistrate Judge concluded that Waldman's explanation was "unpersuasive." (R. & R. at 34 n.26.)[31] We disagree with that conclusion, because it makes eminent sense that crafting nonbinding recitals would take a backseat to negotiating the operative terms of an agreement. As the Sixth Circuit acknowledged, while clear recitals can give meaning to ambiguous operative terms, Recital G is not clear enough to resolve the ambiguity in Term 8. *Cmty. Health Sys.*, 666 F. App'x at 417. *See also Cain Rest. Co. v. Carrols Corp.*, 273 F. App'x 430, 434 (6th Cir. 2008) (recognizing that "recitals or other prefatory provisions of a contract, do not necessarily control over provisions in the operative sections"); *McKissick v. Yuen*, 618 F.3d 1177, 1186 (10th Cir. 2010) (refusing to limit a contractual release's scope based on a recital when the operative clause was unambiguous); *Edwards v. Doe*, 331 F. App'x 563, 573 (10th Cir. 2009) (recitals do not control over operative clauses); 17A C.J.S. Contracts § 403 ("Recitals in a contract, such as 'whereas' clauses, are merely explanations of the circumstances surrounding the execution of the contract, and are not binding obligations, unless the operative provisions of the contract refer to them.").

From our review of the extrinsic evidence, we cannot find that Recital G points us in any helpful direction to determine the scope of Term 8. Recital G was instead yet another instance in

---

[31] The Report and Recommendation cites Hrg. Tr. 273:18–274:17 as the relevant passage of Waldman's testimony. This appears to be a mistaken citation, the correct one being Hrg. Tr. 243:18–244:17.

which Relators claimed entitlement to attorneys' fees under the False Claims Act.[32]  That statement does nothing to suggest that CHS had waived its right to challenge their entitlement under the terms of the Settlement Agreement.

> **3.    The forum selection provision does not indicate a clear intent to limit attorneys' fee litigation to reasonableness alone.**

The Magistrate Judge cited CHS's acquiescence to Term 18, carving out attorneys' fee disputes from the Settlement Agreement's forum-selection clause, as another means by which CHS tacitly agreed to Relators' entitlement to attorneys' fees.  (R. & R. at 45.)  The Magistrate Judge rejected CHS's contention that Term 18 was not meant to communicate any intent regarding fees.  (*Id.* at 45 n.39.)

Here too we depart from the Magistrate Judge's analysis.  The forum selection provision is more consistent with what appears to be the parties' shared intent to carve out attorneys' fee disputes from the Settlement Agreement altogether.  Communications among Relators; between the Government, Relators, and CHS; and between CHS and Relators all bear out this interpretation.

Relators suggested a carve-out of fees in their earliest edits to the agreement.  When the Government first sent the draft agreement to Relators on April 21, 2014, the forum selection clause read that all future disputes would be brought in the Middle District of Tennessee. (JEX 16 at 353, ¶ 20.)  On April 25, Osman, counsel for relator Carnithan, commented next to the draft venue provision, "If the attorney fee and costs issue is not resolved in the settlement agreement and CHS intends to litigate that issue[,] there should be a carve out for the attorneys['] fees and costs issue to be tried in the jurisdiction where each complaint was filed."

---

[32] We further observe that Recital G was not supplied by Relators in the first instance, but was instead circulated by the Government in the first draft of the agreement that we have in evidence. (JEX 4 at 5 (then labeled Recital F).)

(JEX 17 at 375.)[33]  Raspanti, representing relator Mason, also suggested either "an agreement on attorneys' fees or the usual carve out language" if fees were unresolved before settlement. (JEX 18 at 25.)  Other Relators' counsel agreed with these edits.  (JEX 18 at 22 (Soifer); JEX 19 (O'Connell).)  Specifically, O'Connell commented that one of his "main concern[s]" was "the exclusion of att[orne]y fees from the settlement unless the fees are agreed upon prior to the execution of the settlement agreement."  (JEX 19 at 32.)

Separately, O'Connell, Soifer, Organ, and Kreindler all expressed concern about the first draft's selection of the Middle District of Tennessee to litigate attorneys' fees. (JEX 25 at 104–05.)  They all concurred that they should not agree to that venue unless fees were "agreed 100%," or else they could refuse to sign the ultimate settlement.  (*Id.* at 104.)  Their concerns were for naught, however, because the Government incorporated the forum carve-out for fees in the next draft of the agreement circulated on May 14.  (JEX 31 at 410, ¶ 15(c)(1).) *See also supra* n.10.

Communications between the Government, Relators, and CHS also consistently convey that edits were designed to leave attorneys' fees out of the settlement entirely.  Handrigan, the Government attorney, wrote to Relators' counsel that the May 14 settlement edits were intended "to reflect that . . . attorneys' fees will be addressed after the settlement agreement is executed." (JEX 31 at 394.)  Handrigan wrote to CHS on June 4, "With regard to share/[attorney's] fees, those issues were carved out of this agreement so we can move the settlement along quickly. They can be addressed in separate agreements with relators."  (JEX 46 at 830.)  When Handrigan queried O'Connell on June 23 about the state of negotiations with CHS, O'Connell reported that,

---

[33] The Magistrate Judge deduced from the inclusion of Recital G in this draft that this comment was "clearly referring to reasonableness objections only."  (R. & R. at 17 n.14.)  As the above explication of Recital G should indicate, we disagree with that conclusion.

in all likelihood, "fees will have to be handled after the settlement" because CHS was "making noises about claiming first to file challenges to fees." (JEX 61 at 333.) On July 7, Handrigan again emailed all Relators' counsel to attach "a copy of the most recent settlement agreement, with revisions by CHS carving out the attorneys' fees." (JEX 74 at 663.)

To complete the circle, CHS explicitly stated to Relators its intent to carve out attorneys' fees from the Settlement Agreement up through the final negotiations. Sauber wrote to Kreindler on July 9 that CHS had "consistently told [the Government] we will carve out the fees from the settlement and have sent them a draft doing just that." (JEX 86 at 1292.) Sauber wrote again that day that CHS "told the government repeatedly that attorney's fees would in all likelihood have to be resolved after the settle[ment] was finalized. We were quite explicit about that." (JEX 91 at 1342.)

None of these internal communications evince an intent to limit attorneys' fee litigation to reasonableness alone. The intent instead is to do what they say: carve out attorneys' fee litigation from the settlement altogether unless the final agreement fully resolved the matter.

The Magistrate Judge concluded, "Objectively, a party intending to challenge recoverability of fees would insist on a single forum, to avoid the risk of conflicting determinations of first-to-file and other eligibility issues, a fact that CHS clearly recognized." (R. & R. at 45.) Indeed, Waldman testified that the possibility of conflicting judgments from multiple jurisdictions was among CHS's concerns with the venue provision. Hrg. Tr. 289:21–290:23. But he also testified that this was a risk he and CHS were willing to accept in carving out attorneys' fees from the agreement. Hrg. Tr. 290:21–23 ("Q" . . . But if [multiple venues] was a concern, that wasn't addressed at all in the Settlement Agreement, was it? [Waldman]: That's correct."); *see also* Hrg. Tr. 291:15–292:2 (testifying that the settlement put attorneys' fees aside to be dealt with later). Waldman's testimony is consistent with the

thrust of the contemporaneous extrinsic evidence, which was to cut any resolution of attorneys' fees out of the Settlement Agreement.

We therefore conclude that Term 18 did not signify that CHS knew or had reason to know of Relators' intent to limit the reservation in Term 8 solely to reasonableness challenges.

### D.    CHS's Understanding of Term 8 Prevails

As this extensive review of the evidence reveals, Relators either shared, knew of, or had reason to know of CHS's intent to reserve its right to challenge Relators' entitlement to attorneys' fees, while CHS neither knew nor had no reason to know of Relators' intent to limit challenges to reasonableness alone.  Thus, applying Second Restatement § 201, CHS's understanding of Term 8 must prevail.  CHS is therefore not precluded under the terms of the Settlement Agreement from asserting statutory bars to Relators' attorneys' fees.

### CONCLUSION

For the foregoing reasons, we sustain CHS's objections to the Report and Recommendation and hold that the Settlement Agreement does not bar CHS from challenging Relators' eligibility for attorneys' fees.

Having so held, we must determine next steps.  This opinion resolves only one of three issues identified by the parties upon remand.  (*See* Dkt. No. 256 at 13.)  We must now determine whether, in the face of CHS's challenges, Relators are entitled to attorneys' fees and expenses under the False Claims Act, and if so, what those fees are.  The parties have previously specified that some Relators have briefed some of these issues.  (*Id.* at 14–15.)  The parties are hereby directed to file a joint status report on or by November 15, 2019 that (1) outlines the remaining

issues before this Court, (2) directs us to those briefs already submitted that consider the matter, and/or (3) proposes additional briefing as appropriate.  It is so ordered.

_____
Marvin E. Aspen
United States District Judge

Dated:  October 2, 2019
           Chicago, Illinois